*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

V

NICKLAS LUKE SHERIDAN,

        Defendant-Appellant.

UNPUBLISHED
June 17, 2021

No. 350525
Kent Circuit Court
LC No. 18-000633-FC

Before: BOONSTRA, P.J., and MARKEY and SERVITTO, JJ.

PER CURIAM.

Defendant appeals by right his jury trial conviction of first-degree premeditated murder, MCL 750.316(1)(a). He was sentenced to a mandatory term of life imprisonment without the possibility of parole. On appeal, defendant contends that the evidence was insufficient to support the murder conviction with respect to the elements of premeditation and deliberation. Defendant also argues that the trial court erred by allowing the admission of other-acts evidence pertaining to two instances of domestic violence. For the reasons set forth below, we conclude that neither argument warrants reversal. Accordingly, we affirm the conviction and sentence.

## I. TRIAL TESTIMONY AND EVIDENCE

On December 15, 2017, defendant, his wife Breann Sheridan, their two sons, a one-year-old and a four-month-old, and defendant's mother Lisa Kirkpatrick were all living together in a Kent County apartment. On that day, while the children were home and Kirkpatrick was at Target, defendant stabbed his wife Breann in their bedroom with a knife, killing her. There is no dispute that defendant killed Breann. He contended at trial that he acted in self-defense, that he had no intent to kill Breann, and that the killing was not premeditated. The prosecution's theory was that defendant killed Breann with the requisite malice, that he did so with premeditation and deliberation, and that he did not act in justifiable self-defense. The family had just moved from Florida to Michigan at the beginning of November 2017. Defendant had also previously resided with Kirkpatrick in California. The two incidents comprising the other-acts evidence involved acts of domestic violence defendant committed against Kirkpatrick, one occurring in Florida and

one in California. We will discuss the trial testimony regarding the other-acts evidence in the analysis section of this opinion that addresses the admissibility of the evidence.

Earlier in the day on December 15, 2017, before Kirkpatrick left for Target, there was a lot of tension in the family home. Kirkpatrick testified that she had purchased four "sock hats" for the two boys and was going to return two of them to the store. Kirkpatrick indicated that she asked defendant which two hats she should keep, apparently as Christmas presents, and that Breann then became angry because Kirkpatrick was showing the hats to defendant but not to her, leaving her with having no choice of the hats. Kirkpatrick testified that Breann shouted that there would be no Christmas, that Breann went into her bedroom and slammed the door, that defendant went to the bedroom door and told Breann that Kirkpatrick meant no harm, and that defendant then busted through the door. The door, however, was not damaged. Kirkpatrick claimed that Breann began hitting defendant in the chest and yelling at him to leave her alone. On direct examination, the prosecutor challenged Kirkpatrick with her written statement made to the police after the homicide in which she stated that defendant was in the bedroom feeding the baby and changing his diapers when Breann burst in and broke the facing off the door. Kirkpatrick explained that she was in shock when she made the written statement and that her trial testimony was accurate. Kirkpatrick testified that the situation eventually settled down and that there was no longer any fighting or arguing by the time she took a shower and left for Target to replace a broken cellphone and return the hats.

Defendant's testimony was fairly similar to Kirkpatrick's testimony regarding the events that transpired before Kirkpatrick left for the store.[1] Defendant did contend, however, that Breann came out of the bedroom during the incident concerning the sock hats and slammed the bedroom door, that she punched defendant two or three times, and that when she tried to reenter the bedroom, the door was stuck closed, at which point defendant "pushed" the door and "cracked" it. Defendant maintained that he and Breann then broke out laughing because there had been an ongoing problem with the door ever since they had moved into the apartment. Defendant explained that by the time Kirkpatrick left for Target, the situation regarding the sock hats had ended, and everyone was calm.

Defendant testified that after his mother left for Target, Breann indicated that she did not feel well and started working on a Christmas calendar that she was making. Defendant asserted that Breann subsequently began feeding the four-month-old, and she complained that the baby was fussily eating. Defendant testified that the baby burped and spit up a little, with the spittle rolling down Breann's arm. According to defendant, Breann became incensed and lowered the child toward the floor before dropping him the rest of the way to the floor, which caused the child to bump his head.[2] Defendant confronted Breann, telling her that she could get arrested for what she did to the baby, and Breann reacted angrily. Defendant broadly claimed that Breann was mad and irritable all the time and that he was becoming tired of dealing with her.

---

[1] Defendant, of course, did not testify as part of the prosecution's proofs, but we use his testimony at this stage of our discussion in order to present events in chronological fashion.

[2] Defendant later explained on cross-examination that Breann "put [the baby] down hard."

When Breann reacted angrily to defendant's comment that she could be arrested for dropping the baby and then mockingly asked him if he was going to call the police, defendant grabbed a phone to text Breann's mother that she could take care of Breann because he was fed up. Defendant testified that Breann grabbed the phone and "went insane." He asserted that Breann began asking him if he was going to leave her, punching him and jamming his finger in the process. Defendant testified that he told her that he had no such intention. He claimed that Breann retrieved a knife from the kitchen and placed it to her own neck, threatening to kill herself.[3] Defendant testified that he told her to stop and tried to convince her that he was not going to leave her. He maintained that Breann then turned the knife on him, moving toward him while swinging the knife wildly. According to defendant, the knife made contact with his thumb. Defendant testified that he attempted to wrestle the knife from Breann's hand, that he was able to free the knife from her hand, causing it to fall to the floor, that they both went for the knife, and that he was first to reach and gain control of it. Defendant contended that Breann went wild and began grabbing for the knife. He testified that for about thirty seconds he begged and pleaded for her to stop, but her insane behavior continued unabated. At one point defense counsel asked defendant whether he believed that he was going to be hurt or killed, and defendant answered, "No." Defendant described what he did next, stating, "I look[ed] away and I stripped the knife twice" in Breann's direction. Defendant stated that Breann was then "gone."[4]

Defendant testified that he next called his mother, not 911. He claimed that he did not immediately call 911 because he was thinking about his children. Defendant did call 911 about 15 minutes after his mother returned to the apartment. Kirkpatrick testified that she received defendant's phone call about 45 minutes after she left the apartment and while she was still at Target. Kirkpatrick stated that defendant was screaming and devastated. Kirkpatrick testified that defendant asserted that Breann had started going through Kirkpatrick's bedroom rummaging for Christmas presents, that she verbally threatened to kill him, that she grabbed a knife from the kitchen and came after him, that he got the knife away from her, and that the knife then "got her."[5] When Kirkpatrick arrived back home, she found defendant naked and Breann lying inside the door of defendant and Breann's bedroom. Kirkpatrick testified that defendant was hysterical and kept saying that he acted in self-defense.

Dr. Stephen Cole, a forensic pathologist and the Chief Medical Examiner for Kent County, testified as an expert in forensic pathology. Dr. Cole conducted Breann's autopsy two days after her death. Dr. Cole testified that Breann had two knife wounds to her neck. One of those wounds was 4-1/2 inches deep, went through the upper part of Breann's airway or larynx, and pierced her

---

[3] Detective Kelly Baldwin testified in rebuttal, contending that he interviewed defendant and that defendant never mentioned anything about Breann doing something to the baby, never stated that he texted Breann's mother, and never indicated that Breann held the knife to her own neck. Relevant supporting portions of the videotaped interview were played for the jury.

[4] A neighbor testified that she did not hear any yelling or fighting at or around the time of the killing although she had heard defendant and Breann doing so in the past.

[5] In her statement to the police, Kirkpatrick indicated that defendant told her on the phone that Breann got him in the chest and hand.

right common carotid artery—this was the fatal wound and would have caused her to lose consciousness within 40 to 60 seconds. Dr. Cole explained that the direction of the thrust of the knife into her neck was front-to-back, downward, and left-to-right. He opined that the assailant had been facing Breann, had held the knife in his right hand, and had forcefully buried the knife into Breann's neck. The second knife wound to the neck was superficial, measuring 3/16 of an inch deep, and was drawn across the base of Breann's neck. Dr. Cole also identified a nonfatal knife wound to Breann's left shoulder area that was five inches deep and just missed entering her chest cavity.

He also described "three incised wounds or cuts on the [right] hand" of Breann, one of which was two inches in length. Dr. Cole further indicated that Breann had scrapes or abrasions on the knuckle of her right hand and that she had knife wounds to her left hand. Dr. Cole opined that Breann's wounds to her hands were defensive in nature, explaining as follows:

> Because it's common, very common, for someone who's being stabbed to try to grab – instinctively to grab at the knife, to ward it off or to push it away. And in the context of doing that, oftentimes the person receives a cutting injury to the hand.

Dr. Cole testified that Breann also had two shallow incised wounds, probably from a knife, to her left knee. He opined that Breann had likely been on the ground and raised her knee to fend off the assailant.[6] Dr. Cole could not determine the chronological order of the wounds.

Dawn TenBrink, a crime scene specialist with the Kent County Sheriff's Department, testified that she processed defendant and that he had blood on the front of his body, his face, his feet, and on his back, but the blood was not from injuries to those areas of his body. She indicated that defendant had an injury to one of his thumbs and had small bruises on the index finger of his right hand. TenBrink stated that defendant did not complain of any injury.

Detective Kelly Baldwin testified that, as mostly observed on video footage, Kirkpatrick arrived at Target at about 3:00 p.m., was still at the store at 4:00 p.m., picked up and used her phone at 4:01 p.m., finished the phone call at 4:03 p.m., left the store at 4:04 p.m., and arrived back home at approximately 4:13 p.m. Detective Baldwin stated that the 911 call was made by defendant at 4:30 p.m.

Katherine Merideth, a forensic scientist with the Michigan State Police, testified that she tested various samples from the crime scene for DNA and that, to a very high degree of likelihood, Breann's DNA was on the blade of the kitchen knife and Breann's and defendant's DNA was on the knife's sheath. Jeffrey Gregus, a crime scene investigator with the Kent County Sheriff's Department who was recognized as an expert in blood stain analysis and reconstruction, examined various photographs from the apartment. Gregus testified in regard to blood splatter on the wall

---

[6] Dr. Cole commented about defendant's injury, which he characterized as a small, superficial, and non-life-threatening wound to his thumb. He opined that it could possibly have been a defensive wound, but it would not have been a typical defensive wound.

-4-

under a window in the bedroom where Breann was found, on the headboard of the bed, on the bed, on a closet, and on the bedroom floor. Gregus identified "arterial spurt" on the wall under the window, which is a reference to blood that shoots from the body with tremendous force in the form of a stream and which can go several feet. It is consistent with a knife's striking a carotid artery. Gregus also described the presence of passive-bleeding, contact, impact, and saturation stains. On the basis of the various blood stains and splatter patterns and their location, Gregus opined that the arterial breach or spurt was likely the last injury or "later in the events." He also believed that multiple stabbings occurred in a corner of the bedroom between the bed and a jewelry dresser.

Defendant testified that Breann had twice assaulted Kirkpatrick in the past, once hitting her in the head and cutting her nose. Defendant maintained that he had never previously assaulted Breann. Kirkpatrick testified that Breann had assaulted her on two occasions, that Breann would become jealous when Kirkpatrick bought gifts for the children, that she had witnessed Breann assaulting defendant "quite a bit in Florida," that defendant and Breann argued constantly when they lived in Florida, almost always over interference by Breann's parents, that defendant treated Breann like a queen, and that it was Breann who wanted to move to Michigan. Kirkpatrick admitted that Breann treated her horribly because defendant treated Kirkpatrick horribly.

We note that at the end of the proofs, defendant himself indicated his desire to present his own closing argument instead of counsel. Consequently, after the court obtained a waiver of counsel and advised defendant that he was not making a wise move, defendant presented his closing argument to the jury. The jury deliberated for about an hour and then returned a verdict of guilty on the charge of first-degree premeditated murder.

## II. ANALYSIS

### A. SUFFICIENCY OF THE EVIDENCE

Defendant first argues that the conviction for first-degree premeditated murder must be reversed because the prosecution presented insufficient evidence of premeditation and deliberation in the killing of Breann. We disagree.

In *People v Kenny*, 332 Mich App 394; 956 NW2d 562 (2020), this Court discussed the principles governing a sufficiency argument, observing as follows:

> This Court reviews de novo whether there was sufficient evidence to support a conviction. In reviewing the sufficiency of the evidence, this Court must view the evidence—whether direct or circumstantial—in a light most favorable to the prosecutor and determine whether a rational trier of fact could find that the essential elements of the crime were proven beyond a reasonable doubt. A jury, and not an appellate court, observes the witnesses and listens to their testimony; therefore, an appellate court must not interfere with the jury's role in assessing the weight of the evidence and the credibility of the witnesses. Circumstantial evidence and any reasonable inferences that arise from such evidence can constitute satisfactory proof of the elements of a crime. The prosecution need not negate every reasonable theory of innocence; it need only prove the elements of the crime in the face of whatever contradictory evidence is provided by the defendant. All conflicts

in the evidence must be resolved in favor of the prosecution. [Quotation marks and citations omitted.]

To convict a defendant of first-degree premeditated murder, the prosecution must prove that the defendant caused the death of the victim, that the defendant intended to kill the victim (malice), that the intent to kill was premeditated and deliberate, and that the killing was not justified or excused, if at issue. MCL 750.316(1)(a); *People v Mendoza*, 468 Mich 527, 533-534; 664 NW2d 685 (2003); *People v Kelly*, 231 Mich App 627, 642; 588 NW2d 480 (1998); M Crim JI 16.1. Premeditation means to think about something beforehand, while deliberation means to measure and evaluate the facets of a choice or problem. *People v Plummer*, 229 Mich App 293, 300; 581 NW2d 753 (1998). In *People v Oros*, 502 Mich 229, 242-243; 917 NW2d 559 (2018), our Supreme Court explained the elements of premeditation and deliberation:

> Premeditation and deliberation may be established by an interval of time between the initial homicidal thought and ultimate action, which would allow a reasonable person time to subject the nature of his or her action to a "second look." That is, some time span between the initial homicidal intent and ultimate action is necessary to establish premeditation and deliberation, but it is within the province of the fact-finder to determine whether there was sufficient time for a reasonable person to subject his or her action to a second look. While the minimum time necessary to exercise this process is incapable of exact determination, it is often said that premeditation and deliberation require only a brief moment of thought or a matter of seconds. By the weight of authority the deliberation essential to establish murder in the first degree need not have existed for any particular length of time before the killing. The time within which a wicked purpose is formed is immaterial, provided it is formed without disturbing excitement. The question of deliberation, when all the circumstances appear, is one of plain common sense; and an intelligent jury can seldom be at a loss to determine it. [Quotation marks, citations, and brackets omitted.]

"Though not exclusive, factors that may be considered to establish premeditation include the following: (1) the previous relationship between the defendant and the victim; (2) the defendant's actions before and after the crime; and (3) the circumstances of the killing itself, including the weapon used and the location of the wounds inflicted." *Plummer*, 229 Mich App at 300. Premeditation and deliberation can be inferred from the circumstances surrounding a killing, and "[m]inimal circumstantial evidence is sufficient to prove an actor's state of mind." *People v Ortiz*, 249 Mich App 297, 301; 642 NW2d 417 (2002).

We conclude that when viewing the evidence in a light most favorable to the prosecution, deferring to the jury's assessments concerning credibility and the weight of the evidence, and resolving all evidentiary conflicts in favor of the prosecution, there was sufficient circumstantial evidence and reasonable inferences arising therefrom demonstrating that defendant killed his wife with premeditation and deliberation. Dr. Cole's testimony painted a picture in which defendant viciously struck Breann with the knife *multiple times*, resulting in several defensive-type wounds to both hands and her knee, a deep penetrating wound to her left shoulder area, a slashing wound across the base of her neck, and the fatal neck wound that pierced her right carotid artery, which investigator Gregus opined came at or near the end of the assault. The knife wounds to the neck

and throat area and the other upper body wound strongly suggested that murder was or became the intended goal, especially considering the location and depth of the shoulder and fatal neck wounds. Given the multiple knife wounds, their nature and location, and the span of time necessary to inflict all of Breann's injuries (time for a second look), along with the evidence that defendant and the bedroom were covered in blood splatter, one could reasonably infer that defendant, while perhaps only within a brief moment of thought and matter of seconds, came to the decision to kill Breann with the knife and then followed through on that decision.

Defendant's own testimony was not helpful to his cause, considering that he stated that he was not in fear of being severely injured or killed, yet he stabbed Breann several times with the knife. He also testified that he had become fed up with her behavior and angry demeanor, which would lend support for a conclusion that he acted with premeditation and deliberation in killing Breann. Furthermore, there were inconsistencies between defendant's trial testimony about the immediate events that led up to the killing and Kirkpatrick's testimony regarding the statements defendant made when he phoned her and explained the precipitous events. There was also defendant's failure to inform the police with respect to significant aspects of his story that he recounted for the jury, e.g., the alleged dropping of the baby and Breann's act of holding the knife to her own throat. Additionally, defendant's failure to immediately call 911 to potentially obtain life-sustaining treatment suggested that he had acted with premeditation and deliberation. To the extent that defendant's trial testimony tended to vitiate the findings of premeditation and deliberation, we note that the jury was free to determine that he lacked credibility, and we will not interfere with that assessment.

Defendant argues that all of the evidence that we have cited in support of finding sufficient evidence of premeditation and deliberation can just as easily support a conclusion that "the wounds were inflicted as a result of an impulse killing." Perhaps defendant is correct, but his argument reflects a fundamental misunderstanding of sufficiency analysis. Indeed, his premise implicitly accepts that there was sufficient evidence to support the first-degree murder conviction. The jury reached the conclusion that defendant acted with premeditation and deliberation in killing Breann, and our role is simply to determine whether there was sufficient evidence in the record to support that verdict, not whether there was sufficient evidence to reach a different verdict on the elements of premeditation and deliberation—we are not jurors. See *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000) (the prosecutor need not negate every reasonable theory of innocence; he or she need only prove the elements of the crime in the face of whatever contradictory evidence is provided by the defendant). In sum, we hold that the evidence was sufficient to support the conviction for first-degree premeditated murder.

## B. OTHER-ACTS EVIDENCE

With respect to the incident in Florida, Kirkpatrick testified that she and Breann started quarreling about Breann's use of Kirkpatrick's airbed mattress and that defendant became involved at Breann's behest and "used a little pair of [sewing] scissors" to puncture the mattress while Kirkpatrick was retrieving something from her closet. Kirkpatrick indicated that because she was in the closet at the time, she could not even positively state that it was defendant who punctured the mattress, as opposed to Breann. Kirkpatrick conceded that she had previously informed the police here that defendant punctured the mattress with a knife and that she had testified at the preliminary examination that he wielded a knife during the incident, not a pair of scissors. With

respect to these past disclosures that defendant punctured the mattress with a knife, Kirkpatrick stated that she was simply "mistaken." A taped phone call between defendant and Kirkpatrick while defendant was jailed was played for the jury, and defendant stated on the call that he was "screwed" because of Kirkpatrick's description of his use of a knife in the Florida assault. Defendant told Kirkpatrick over the phone that the purported Florida incident never happened and that her lies could put him in prison. But Kirkpatrick testified that the incident did happen, although it only involved the pair of scissors. She denied that the phone conversation caused her to change her story about the involvement of a knife. Defendant testified that he punctured the airbed mattress with scissors to stop the bickering between his mother and Breann, blurting out at the time of the incident, "problem solved," and that he did not "like the stupid bed anyway." Defendant claimed that Kirkpatrick did not even directly see him do it and that she yelled "what the hell" when she discovered what had happened. The police in Florida were not contacted, and there was no criminal prosecution over the incident.

With respect to the California incident, Kirkpatrick testified that defendant pushed her down and pulled at her shirt because he was dissatisfied at how she had made his bed. Kirkpatrick acknowledged that she told the police in California that defendant shoved her, pushed her down, and ripped her shirt. According to Kirkpatrick, some anonymous person who disliked defendant phoned the police about the incident; she did not call the police. Kirkpatrick also conceded that she told authorities in Michigan and testified at the preliminary examination that defendant's act included ripping her shirt, not just pulling it. Defendant testified that he did not rip his mother's shirt and that he "[j]ust smacked her on the arm and nudged her on the couch." He also claimed that he had acted out because he was upset, as they were losing their money, their "stuff," and their home in California. Defendant acknowledged that in a jailhouse phone call to his mother, he tried to talk her out of saying anything about the California incident because it was unnecessary to bring up matters that were irrelevant to the murder charge. The California incident did not result in any conviction, nor does it appear that charges were brought.

In a pretrial hearing, the trial court ruled that the evidence of the two incidents was admissible under both MRE 404(b) and MCL 768.27b in light of the fact that defendant was raising a self-defense argument and the two incidents showed defendant acting as an aggressor. On appeal, defendant initially argues that the Florida incident did not constitute an act of domestic violence because Kirkpatrick did not even see defendant stab the mattress. The primary argument defendant asserts is that the probative value of the other-acts evidence was substantially outweighed by the danger of unfair prejudice for purposes of MRE 403.

"A trial court's evidentiary ruling is reviewed for [an] abuse of discretion." *People v Railer*, 288 Mich App 213, 219; 792 NW2d 776 (2010). But a preliminary question of law pertaining to the admission of other-acts evidence is reviewed de novo. *Id.*

MCL 768.27b(1) provides that evidence of a defendant's prior acts of domestic violence is admissible, if relevant and not excludable under MRE 403, "in a criminal action in which the defendant is accused of an offense involving domestic violence[.]" In *Railer*, 288 Mich App at 219-220, the panel stated:

> Under MRE 404(b), the prosecution may not present evidence of a defendant's other crimes, wrongs, or acts in order to show a defendant's propensity

to commit a crime. Notwithstanding this prohibition, however, in cases of domestic violence, MCL 768.27b permits evidence of prior domestic violence in order to show a defendant's character or propensity to commit the same act. [Citations omitted.]

First, we reject defendant's argument that the Florida incident did not involve domestic violence. Puncturing Kirkpatrick's airbed mattress with a knife qualified as an act of domestic violence, regardless of whether she directly observed the act or discovered it almost immediately upon exiting the closet; she was in the room. See MCL 768.27b(6)(a)(*i*) (defining "domestic violence" as including an attempt to cause mental harm to a family member) and (a)(*iv*) ("domestic violence" also includes "[e]ngaging in activity toward a family or household member that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested").[7]

We now turn to defendant's argument under MRE 403. As noted earlier, MCL 768.27b allows the admission of evidence of prior acts of domestic violence if the evidence "is not otherwise excluded under Michigan rule of evidence 403." MCL 768.27b(1); *People v Cameron*, 291 Mich App 599, 610; 806 NW2d 371 (2011).[8] MRE 403 provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

"All evidence offered by the parties is 'prejudicial' to some extent, but the fear of prejudice does not generally render the evidence inadmissible." *People v Mills*, 450 Mich 61, 75; 537 NW2d 909 (1995). MRE 403 prohibits the admission of marginally probative evidence that will likely be given undue weight—that is, "evidence which is minimally damaging in logic will be weighed by the jurors substantially out of proportion to its logically damaging effect." *Id*. at 75-76 (quotation marks and citation omitted).[9]

---

[7] The jury was instructed that before it could consider the other-acts evidence it had to "first find that the defendant actually committed such acts." While we cannot ascertain whether the jury found that defendant committed the act in Florida or that he did so with a knife, as opposed to scissors, we believe that the analysis regarding the admissibility of the evidence under MCL 768.27b permits us to proceed on the basis that a knife was employed, as there was evidence that defendant punctured the mattress with a knife.

[8] Although the trial court delved into MRE 404(b) and defendant thus does so on appeal, we find it unnecessary to explore MRE 404(b) other than to say that the analysis under MRE 404(b) also entails examination of MRE 403. See *People v VanderVliet*, 444 Mich 52, 74-75; 508 NW2d 114 (1993), amended on other grounds by 445 Mich 1205 (1994).

[9] In *People v Watkins*, 491 Mich 450, 487-488; 818 NW2d 296 (2012), our Supreme Court, addressing MCL 768.27a, noted that while prior sexual acts committed against minors could be

We agree both incidents were probative to an extent because they demonstrated that defendant had a propensity to introduce violence, including the use of a knife in the Florida matter, into situations that had only involved verbal altercations or disagreements. That propensity was relevant in the context of the murder charge given defendant's assertion of self-defense premised on his claim that Breann first introduced violence by swinging the knife at him. Additionally, because Breann could not speak to the events that transpired, there was arguably a need for the evidence to counter the biased description of events given by the only other eyewitness to the killing, defendant. On the other hand, the other acts were dissimilar to the charged crime of murder: they were infrequent; Breann was not the victim in either case, and the California incident occurred years earlier.

Given the nature and characteristics of the Florida and California incidents, i.e., puncturing Kirkpatrick's waterbed with a knife and pushing Kirkpatrick down and ripping her shirt, respectively, we conclude they were not particularly probative of defendant's propensity to personally attack and stab Breann with a knife. For the very same reason, the two incidents were not particularly prejudicial to defendant such that the jury would have weighed the evidence *substantially* out of proportion to the damaging effect of the evidence because the probative value and the prejudicial impact of the evidence were both marginal. Therefore, we cannot conclude that the trial court abused its discretion or otherwise erred by admitting the other-acts evidence. See *People v Aldrich*, 246 Mich App 101, 113; 631 NW2d 67 (2001) ("A decision on a close evidentiary question ordinarily cannot be an abuse of discretion.").

The truly damaging effect on defendant did not stem from the nature and characteristics of the two incidents themselves but instead from the associated testimony and evidence showing inconsistencies in the accounts given by defendant and Kirkpatrick concerning what actually occurred in Florida and California. The inconsistencies and changes in their stories and the accompanying collusion by phone likely lowered their credibility in the eyes of the jurors, not only as to the circumstances surrounding the other acts but also with respect to the events on the day of the murder. This form of prejudice was not relevant to the analysis under MRE 403, which focuses on examining the prejudice arising from the subject matter of the evidence and not on associated

introduced to show propensity, it did not mean that MRE 403 could never be invoked to exclude evidence under MCL 768.27a:

> There are several considerations that may lead a court to exclude such evidence. These considerations include (1) the dissimilarity between the other acts and the charged crime, (2) the temporal proximity of the other acts to the charged crime, (3) the infrequency of the other acts, (4) the presence of intervening acts, (5) the lack of reliability of the evidence supporting the occurrence of the other acts, and (6) the lack of need for evidence beyond the complainant's and the defendant's testimony. This list of considerations is meant to be illustrative rather than exhaustive. [Citations omitted.]

By analogy, we conclude that the same principles would apply to the analysis of MRE 403 under MCL 768.27b.

-10-

credibility issues. And even if so, the prejudice certainly could not be deemed "unfair." Moreover, assuming error by the trial court in admitting the other-acts evidence, defendant simply fails to demonstrate the requisite prejudice in light of the strong untainted forensic evidence of guilt and defendant's inconsistent and varying statements regarding what transpired on December 15, 2017. See MCL 769.26 (requiring a miscarriage of justice to reverse based on evidentiary error); *People v Lukity*, 460 Mich 484, 495; 596 NW2d 607 (1999).

### III. CONCLUSION

The evidence was sufficient to support the jury's findings of premeditation and deliberation. Nor did the trial court err by admitting the other-acts evidence, and even if it had, the presumed error was harmless.

We affirm.

/s/ Mark T. Boonstra
/s/ Jane E. Markey
/s/ Deborah A. Servitto