PEOPLE v PLUMMER

Docket No. 199770. Submitted December 2, 1997, at Detroit. Decided April 10, 1998, at 9:35 A.M. Leave to appeal denied, 457 Mich 863.

Robert G. Plummer was convicted by a jury in the Berrien Circuit Court, Casper O. Grathwohl, J., of first-degree, premeditated murder, assault with intent to commit murder, and possession of a firearm during the commission of a felony after he shot and killed one person and shot and injured another during a melee at a bar. The defendant appealed.

The Court of Appeals *held*:

1. The first-degree murder conviction must be vacated and the case must be remanded for the entry of a conviction of second-degree murder and a sentencing for that offense because there was insufficient evidence of premeditation and deliberation for a conviction of premeditated murder. To premeditate is to think about beforehand; to deliberate is to measure and evaluate the major facets of a choice or problem. While the minimum time necessary to exercise this process is incapable of exact determination, the interval between initial thought and ultimate action should be long enough to afford a reasonable person time to subject the nature of the person's response to a second look. When, as in this case, the evidence establishes a fight and then a killing, there must be showing of a thought process undisturbed by hot blood in order to establish premeditation. The critical inquiry is not only whether the defendant had time to premeditate, but also whether the defendant had the capacity to do so. Under the facts of this case, the defendant did not have the ability to engage in the cool and orderly reflection necessary to elevate the killing of the decedent from second-degree murder to first-degree murder.

2. There was sufficient evidence to support the conviction of assault with intent to murder, whose elements are an assault with an actual intent to kill, which, if successful, would make the killing murder. The jury could have reasonably inferred that the defendant fired at one person with the intent of killing him and that this intent transferred to the bystander who was wounded by that shot.

3. The trial court properly exercised its discretion to deny the defendant's motion for a new trial on the asserted ground that the

verdict was against the great weight of the evidence. Even if the scientific evidence linking him to the crimes was inconclusive, as the defendant argued, the record was by no means devoid of evidence linking the defendant to the pistol used for the shootings.

4. The claim of ineffective assistance of counsel at trial is without merit. Counsel did not err in informing the jury at voir dire that the defendant would testify when, in fact, he did not. The defendant's belated decision not to testify was made against counsel's advice. In light of the defendant's decision not to testify, counsel did not err in presenting the conflicting defenses of self-defense and insufficient proof by the prosecution.

Conviction of first-degree murder vacated; convictions of assault with intent to murder and felony-firearm affirmed; case remanded for entry of conviction of second-degree murder and sentencing for second-degree murder.

1. HOMICIDE — FIRST-DEGREE MURDER — PREMEDITATION AND DELIBERATION.

Premeditation and deliberation of a killing that occurs in a melee require proof of a thought process undisturbed by hot blood or of an interval between the initial homicidal intent and the homicidal act that allows for cool-headed reflection (MCL 750.316; MSA 28.548).

2. CRIMINAL LAW — ASSAULT WITH INTENT TO MURDER.

The crime of assault with intent to murder consists of an assault with an actual intent to kill, which, if successful, would constitute murder (MCL 750.83; MSA 28.278).

3. CRIMINAL LAW — NEW TRIAL — VERDICT AGAINST GREAT WEIGHT OF EVIDENCE.

A trial court, at its discretion, may grant a new trial when a verdict is against the great weight of the evidence; a verdict is against the great weight of the evidence when there is no reasonable support for it in the evidence and it is more likely attributable to factors outside the record, such as passion, prejudice, or other extraneous considerations.

4. CRIMINAL LAW — INEFFECTIVE ASSISTANCE OF COUNSEL.

A defendant who claims ineffective assistance of counsel must establish that the performance of counsel was below an objective standard of reasonableness under prevailing professional norms and that a reasonable probability exists that, in the absence of the claimed errors by counsel, the outcome of the proceedings would have been different; the defendant must overcome a strong presumption that counsel used sound strategy.

*Frank J. Kelley*, Attorney General, *Thomas L. Casey*, Solicitor General, *Angela M. Pasula*, Prosecuting Attorney, and *Elizabeth A. Wild*, Assistant Prosecuting Attorney, for the people.

State Appellate Defender (by *P. E. Bennett*), for the defendant on appeal.

Before: KELLY, P.J., and CAVANAGH and N. J. LAMBROS*, JJ.

CAVANAGH, J. Defendant appeals as of right from his convictions of first-degree, premeditated murder, MCL 750.316; MSA 28.548, assault with intent to commit murder, MCL 750.83; MSA 28.278, and possession of a firearm during the commission of a felony, MCL 750.227b; MSA 28.424(2). Defendant was sentenced to life without parole for the murder conviction and thirty to ninety years' imprisonment for the assault conviction, both to be served consecutively to a two-year term of imprisonment for the felony-firearm conviction. We vacate the conviction of first-degree murder and remand for entry of a conviction of second-degree murder, MCL 750.317; MSA 28.549. We affirm defendant's other convictions.

During the early morning hours of September 18, 1995, defendant and his brother, Mark Plummer, were at the New Image Lounge in Niles. Defendant was wearing a black leather jacket. The decedent, Damon Hatcher, was also at the New Image Lounge along with several of his relatives, including Kevin Day.

Around 1:30 A.M., Day and Plummer began arguing in the pool room. Defendant and the decedent were

---

* Circuit judge, sitting on the Court of Appeals by assignment.

also in the pool room at that time. A witness, Israel Bennett, testified that Day and Plummer exchanged words and that Day struck Plummer in the jaw with his fist, causing Plummer to fall to the floor. Plummer stood up, attempted to retaliate, and was again struck by Day. When Plummer went down, defendant tried to step in to help but Bennett stopped him, indicating that the fight was between Day and Plummer. Bennett then observed defendant hesitate for a moment, pull out his pistol and hold it at his side, give Bennett a threatening look, and subsequently turn to focus on his brother, who was lying on the floor with Day standing over him. Just then, the decedent ran from the other side of the bar toward Day, yelling, "Man break that up." The decedent approached with his hand extended to push Day back, but tripped and fell against the wall. As the decedent attempted to stand, defendant "panicked," raised his pistol and shot at the decedent's back, striking him in the left shoulder. Defendant then pulled Plummer from the floor and ran out the door with his pistol still in hand.

Marcus Hatcher, the decedent's cousin, testified that he observed the decedent run toward Day and Plummer and saw him trip and fall. Hatcher stated that after this occurred, defendant moved his hand so that the gun was aimed in a downward direction and fired, striking the decedent. Defendant fired a second shot, then grabbed Plummer and ran, "looking real paranoid like." As he left the bar, defendant fired a third shot "[l]ike he was shooting at somebody."

Christine Jolliff testified that she was in the New Image Lounge at the time of the incident. Jolliff observed defendant holding a gun and subsequently heard gunfire. As she tried to flee, Jolliff looked

down, saw blood coming from her leg, and realized that she had been shot.

Day testified that Plummer was drunk at the time of their altercation. Plummer confronted him, apparently about a woman, and the two "commenced to arguing." Day explained that he hit Plummer only after Plummer began to raise his hand against Day. After Day struck Plummer, Day heard someone say, "He has a gun." Day turned, saw the gun in defendant's hand, and ran. Day heard two shots and was near Jolliff when he saw that she had been struck in the leg.

Clint Woods testified that he saw two black men arguing with Day at the New Image Lounge. He then witnessed one of them, who was wearing a black leather jacket, use a black gun to shoot the decedent and a female patron.

Kevin Scaife stated that he witnessed a man in a black leather jacket chase Day out of the pool room as he shot at him. Scaife believed that the man was aiming at Day when he shot a woman in the leg.

Michigan State Police Trooper John Moore testified that he was called to the New Image Lounge at approximately 1:30 A.M. or 2:00 A.M. for crowd control purposes. Shortly after his arrival, he observed a sudden surge of people running from the bar, some yelling that there had been a shooting inside. Moore stated that one of the female patrons fleeing from the building identified a man in a black leather jacket as the shooter. Moore then ordered the man, whom he identified as defendant, to the ground. Defendant briefly lowered himself but then rose again and took several additional steps. However, defendant complied when Moore again ordered him to stop, and

Moore and Officer Jimmy Kidwell of the Niles Police Department then took defendant into custody.

Kidwell testified that, when he and Moore were attempting to apprehend defendant and his brother, he observed defendant stoop and throw something underneath a parked car. After defendant was taken into custody, Kidwell went back to the location where he had seen defendant bend down and retrieved a .25 caliber gun from underneath the car. Defendant told Kidwell that the gun did not belong to him.

Officer Fulton Moore of the Niles Police Department reported that, when he booked defendant, he discovered a gun holster hooked over defendant's belt and situated between his pants and his shorts. Defendant told Officer Moore that outside the bar, he had tripped and the gun had fallen out of the holster. Detective James Merriman, also of the Niles Police Department, reported that a preliminary breath test indicated that defendant's blood alcohol level was 0.10 percent.

Pathologist John Landgraf testified that he had performed an autopsy on the decedent. The decedent had sustained a gunshot wound to his upper back. The bullet pierced the decedent's aorta, and he bled to death.

Stuart Burritt, a firearms expert, testified that in his opinion the gun was less than fifteen inches from the decedent's body when the fatal shot was fired. Burritt also reported that he examined two .25 caliber shell casings retrieved from the scene, along with the bullet found on the floor of the bar and the one retrieved from the decedent's body. Burritt could not say with certainty whether the shell casings had been fired from the .25 caliber pistol found by Kidwell. However,

Burritt believed that the two bullets had been discharged from the same weapon and that they could have been fired by the .25 caliber pistol. In addition, Burritt noted that there were "gross similarities" between the markings observed on the spent shell casings found at the scene and those observed on the casings subsequently fired from the pistol.

On April 16, 1996, a jury found defendant guilty of first-degree, premeditated murder, assault with intent to commit murder, and felony-firearm. Defendant appeals as of right.

I

Defendant first argues on appeal that there was insufficient evidence to support his convictions of first-degree, premeditated murder and assault with intent to commit murder. When ascertaining whether sufficient evidence was presented at trial to support a conviction, this Court must view the evidence in a light most favorable to the prosecution and determine whether a rational trier of fact could find that the essential elements of the crime were proved beyond a reasonable doubt. *People v Wolfe*, 440 Mich 508, 515; 489 NW2d 748 (1992). Circumstantial evidence and reasonable inferences arising therefrom may be sufficient to prove the elements of a crime. *People v McKenzie*, 206 Mich App 425, 428; 522 NW2d 661 (1994).

A

Defendant contends that there was insufficient evidence of premeditation to support his conviction of first-degree murder. Premeditation is an essential element of first-degree, premeditated murder. *People v*

*DeLisle*, 202 Mich App 658, 660; 509 NW2d 885 (1993). Although there is no specific time requirement, sufficient time must have elapsed to allow the defendant to take a "second look." *Id.*; *People v Anderson*, 209 Mich App 527, 537; 531 NW2d 780 (1995). This Court has explained:

> [I]t underscores the difference between the statutory degrees of murder to emphasize that premeditation and deliberation must be given independent meaning in a prosecution for first-degree murder. The ordinary meaning of the terms will suffice. To premeditate is to think about beforehand; to deliberate is to measure and evaluate the major facets of a choice or problem. As a number of courts have pointed out, premeditation and deliberation characterize a thought process undisturbed by hot blood. While the minimum time necessary to exercise this process is incapable of exact determination, the interval between initial thought and ultimate action should be long enough to afford a reasonable man time to subject the nature of his response to a "second look."
>
> This interpretation of premeditation and deliberation in no way departs from existing Michigan law. Time and again the Michigan Supreme Court has reversed convictions where the evidence of premeditation and deliberation was insufficient to warrant submission of a charge of first-degree murder to the jury. In each case, the homicide occurred during an affray whose nature would not permit cool and orderly reflection. [*People v Morrin*, 31 Mich App 301, 329-331; 187 NW2d 434 (1971).]

Though not exclusive, factors that may be considered to establish premeditation include the following: (1) the previous relationship between the defendant and the victim; (2) the defendant's actions before and after the crime; and (3) the circumstances of the killing itself, including the weapon used and the location of the wounds inflicted. *People v Coddington*, 188

Mich App 584, 600; 470 NW2d 478 (1991). Premeditation and deliberation may be inferred from all the facts and circumstances, but the inferences must have support in the record and cannot be arrived at by mere speculation. *People v Conklin*, 118 Mich App 90, 94; 324 NW2d 537 (1982).

A pause between the initial homicidal intent and the ultimate act may, in the appropriate circumstances, be sufficient for premeditation and deliberation. See *People v Tilley*, 405 Mich 38, 45; 273 NW2d 471 (1979). However, the Legislature's use of the words "willful," "deliberate," and "premeditated" in the first-degree murder statute indicates its intent to require as an element of that offense substantially more reflection on and comprehension of the nature of the act than the mere amount of thought necessary to form the intent to kill. As the Supreme Court has stated, "when a homicide occurs during a sudden affray . . . it would be 'a perversion of terms to apply the term deliberate to any act which is done on a sudden impulse.' " *Tilley, supra* at 44-45, quoting *Nye v People*, 35 Mich 16, 18 (1876). To speak of premeditation and deliberation being instantaneous, or taking no appreciable time, destroys the statutory distinction between first- and second-degree murder. See *Morrin, supra* at 329; LaFave & Scott, Criminal Law (2d ed), § 7.7, p 643.

When the evidence establishes a fight and then a killing, there must be a showing of "a thought process undisturbed by hot blood" in order to establish first-degree, premeditated murder. *Morrin, supra* at 329-330. The critical inquiry is not only whether the defendant had the time to premeditate, but also whether he had the *capacity* to do so. "Without such

evidence, the sequence of events is as consistent with an unpremeditated killing—following hard on the outset of the argument—as it is with a premeditated killing after an interval during which there was an opportunity for cool-headed reflection." *People v Gill*, 43 Mich App 598, 606-607; 204 NW2d 699 (1972).

In *Tilley, supra*, the defendant's friend and the victim, an off-duty sheriff's deputy, had an argument outside a restaurant. The victim drew his gun, placed the friend under arrest, and requested the restaurant bouncer to call the police. Defendant, his friend, and the victim then began to struggle, and the defendant obtained the victim's weapon. While the victim was retreating toward the restaurant, the defendant fired five or six shots, some in the parking lot and some inside the restaurant. *Tilley, supra* at 42-43. The Supreme Court held that there was sufficient evidence of premeditation and deliberation to support the defendant's conviction of first-degree murder. First, the evidence indicated that the fighting had ended either when defendant obtained possession of the victim's gun or when the victim began to retreat. Second, there was an interval of between one second and one minute between the time the defendant seized the gun and the time he fired it. Third, there was a time lapse between the volley of shots fired in the parking lot and the volley fired inside the restaurant. Finally, the defendant had to raise the gun before firing the second volley of shots. *Id.* at 45.

Under the facts of this case, we do not believe that defendant had the ability to engage in the "cool and orderly reflection" necessary to elevate his crime from second-degree to first-degree murder. See *Morrin, supra* at 331. Moments before he shot the dece-

dent, defendant witnessed Day strike Plummer in the face twice. Plummer fell to the floor, where he remained motionless. Defendant quite possibly believed, reasonably or not, that Day had seriously injured his brother during the altercation. Further, Day continued to stand over the spot where Plummer lay supine. Right before defendant drew his pistol, a bystander prevented him from approaching and aiding his brother. The decedent, while shouting, then ran toward Day and Plummer immediately before defendant shot him in the back. This heated situation was not conducive to a "second-look" weighing of the choice of shooting and killing the decedent. Indeed, one witness stated that defendant "panicked" when he shot the decedent, while another bystander stated that, immediately after shooting the decedent, defendant appeared to be "real paranoid like."

Furthermore, evidence showed that defendant had a blood alcohol level of approximately 0.10 percent during the shooting. Under the motor vehicle code, a person driving with that blood alcohol level is presumed to be under the influence of intoxicating liquor. See MCL 257.625a(9); MSA 9.2325(1)(9); *People v Calvin*, 216 Mich App 403, 408; 548 NW2d 720 (1996). Thus, it is even less likely that defendant subjected his actions to any analysis before he pulled the trigger.

The facts of this case are easily distinguishable from those in *Tilley*. In *Tilley*, the defendant fired several shots at the victim after the altercation had ended. The defendant then followed the victim into a nearby restaurant, raised the gun, and fired a second volley of shots at the victim. *Tilley, supra* at 45. Here, defendant appears to have reacted when the decedent

unexpectedly charged into an ongoing fray. While there is evidence that defendant aimed at the decedent, such evidence by itself only establishes that defendant intended to kill the decedent, not that the killing was premeditated.

We recognize that defendant drew his gun and held it to his side for a time before shooting the decedent. However, the fact that defendant took out his gun does not establish that he was planning to use it.[1] Even if, for the sake of argument, we assume that defendant's action indicates that he was contemplating murder, defendant presumably would have been considering shooting Day, not the decedent.[2] Defendant had no way of knowing that the decedent would

---

[1] The prosecutor argues that the fact that defendant went to the New Image Lounge with a loaded gun establishes premeditation and deliberation. However, use of a deadly weapon only establishes premeditation where circumstances show a motive or plan that would enable the trier of fact to infer that the killing was not a spur-of-the-moment decision. *People v Waters*, 118 Mich App 176, 186-187; 324 NW2d 564 (1982). In the present case, there is no evidence that defendant either procured the gun or brought it with him on the night in question as part of a plan to shoot the decedent or anyone else.

Furthermore, holding a weapon at one's side does not definitively establish an intent to shoot another. For example, a person may bring out a weapon for self-defense if needed or as a warning to others. Defendant's action of holding the gun at his side may be contrasted with the situation in *Tilley, supra*, in which the Supreme Court held that the fact that the defendant held the pistol with two hands was indicative of premeditation and deliberation, apparently reasoning that the action indicated a desire to steady the weapon as he fired. See *Tilley, supra* at 46.

[2] Under the doctrine of transferred intent, where A aims at B, intending to kill him, but misses and hits C, killing her, A is held guilty of the murder of C. *People v Youngblood*, 165 Mich App 381, 388; 418 NW2d 472 (1988). However, that doctrine does not apply in this instance because, regardless of whether defendant had been contemplating shooting Day, at the time the decedent was shot, defendant had not taken any overt actions toward killing Day. There is no evidence that a bullet intended for Day struck the decedent. On the contrary, Marcus Hatcher's testimony indicates that defendant deliberately aimed at the decedent before pulling the trigger.

attempt to intervene in the altercation between Day and Plummer. The evidence at trial established that the decedent ran toward the combatants, tripped and fell, and was shot by defendant as he attempted to get up. Here, in the confusion during the brawl, there does not appear to have been a sufficient amount of time for defendant to take a second look at the nature of his actions, "undisturbed by hot blood." See *Morrin, supra.* One cannot instantaneously premeditate a murder. *People v Johnson,* 427 Mich 98, 148; 398 NW2d 219 (1986) (ARCHER, J., dissenting); *People v Smith,* 81 Mich App 190, 199; 265 NW2d 77 (1978).

Because we find that premeditation and deliberation were not established beyond a reasonable doubt, we vacate defendant's conviction of first-degree, premeditated murder and remand for entry of judgment of conviction of second-degree murder and for sentencing for that conviction.

B

Defendant also argues that there was insufficient evidence presented to support his conviction of assault with intent to commit murder. The elements of the crime of assault with intent to commit murder are (1) an assault, (2) with an actual intent to kill, (3) which, if successful, would make the killing murder. *People v Lugo,* 214 Mich App 699, 710; 542 NW2d 921 (1995).

The evidence presented at trial established that, after shooting the decedent, defendant fired a shot at Day while the latter was attempting to run away. Jolliff, who was standing near Day, sustained a bullet wound to her left leg. From these facts, the jury could reasonably infer that defendant shot at Day with the

intent to kill him, and that this intent transferred to Jolliff. See n 2, *supra*; *People v Lawton*, 196 Mich App 341, 350-351; 492 NW2d 810 (1992).

II

Defendant next argues that he is entitled to reversal, or in the alternative a remand to the lower court for reconsideration of his motion for a new trial, because the trial court failed to exercise its discretion to assess the propriety of the jury's determination of the weight of the evidence and the credibility of the witnesses. We disagree.

A trial court's decision on a motion for a new trial is reviewed for an abuse of discretion. *People v Legrone*, 205 Mich App 77, 79; 517 NW2d 270 (1994). A new trial may be granted when the verdict is against the great weight of the evidence. *People v Herbert*, 444 Mich 466, 475; 511 NW2d 654 (1993). A trial court may grant a new trial after finding that the testimony of the prosecutor's witnesses is not credible, thereby acting as the thirteenth juror. *Id.* at 476-477. The trial court may vacate a verdict only when it does not find reasonable support in the evidence, but is more likely attributable to factors outside the record, such as passion, prejudice, sympathy, or other extraneous considerations. *DeLisle, supra.*

This Court has stated:

> [W]hen sitting as a thirteenth juror, the hurdle a judge must clear to overrule a jury, is unquestionably among the highest in our law. It is to be approached by the court with great trepidation and reserve, with all presumptions running against its invocation. [*People v Bart (On Remand)*, 220 Mich App 1, 13; 558 NW2d 449 (1996).]

In the present case, the trial court's ruling on defendant's motion for a new trial was undeniably terse. Nevertheless, the fact that the trial court declined to act as the "thirteenth juror"[3] does not indicate a failure to exercise its discretion. In his motion for a new trial, defendant did not challenge the credibility of any particular witness or witnesses; rather, he pointed out that the scientific evidence does not definitively establish that he was the shooter. However, even though the scientific evidence is inconclusive, the record is by no means devoid of evidence linking defendant to the pistol or the shootings. The trial court did not abuse its discretion in ruling that ascertaining the identity of the shooter was a matter properly left to the jury.

III

Finally, defendant argues that his trial counsel was ineffective. A defendant who claims ineffective assistance of counsel must establish that (1) the performance of counsel was below an objective standard of reasonableness under prevailing professional norms and (2) a reasonable probability exists that, in the absence of counsel's unprofessional errors, the outcome of the proceedings would have been different. *People v Pickens*, 446 Mich 298, 302-303; 521 NW2d 797 (1994). A defendant must overcome a strong presumption that counsel used sound trial strategy. *Peo-*

---

[3] In the recent decision of *People v Lemmon*, 456 Mich 625, 636-642; 576 NW2d 129 (1998), the Supreme Court held that the "thirteenth juror" standard introduced in *Herbert, supra,* was erroneous. However, because the Court stated that its holding in *Lemmon* applies prospectively to cases not yet final on the date of that decision, we review this issue under the *Herbert* standard. We note, however, that we would reach the same result if this issue were analyzed under the standard set forth in *Lemmon*.

*ple v Stanaway*, 446 Mich 643, 687; 521 NW2d 557 (1994), cert den sub nom *Michigan v Caruso*, 513 US 1121 (1995). Because defendant failed to move in the trial court for a *Ginther*[4] hearing or a new trial on the basis of ineffective assistance of counsel, this Court's review is limited to errors apparent on the record. *People v Hurst*, 205 Mich App 634, 641; 517 NW2d 858 (1994).

Effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise. *Stanaway, supra* at 687. When considering a claim of ineffective assistance of counsel, counsel's performance must be considered without benefit of hindsight. Moreover, a defendant must overcome the presumption that the challenged action might be considered sound trial strategy. *People v LaVearn*, 448 Mich 207, 216; 528 NW2d 721 (1995).

Defendant first argues that his trial counsel was ineffective for informing the jury during voir dire that defendant would testify, when defendant did not in fact testify. From our review of the record, it appears that, after voir dire and against the advice of counsel, defendant decided not to testify. In response to the trial court's inquiries, defendant indicated that counsel had informed him of his rights, he was aware that the defense of self-defense could fail if he did not testify, and he was satisfied with counsel's performance. Although defendant asserts on appeal that he was in fact dissatisfied with counsel's performance, this claim is contrary to what he stated in open court. Accordingly, we reject it as a basis either for reversal or for an evidentiary hearing. See *People v Gist*, 188

---

[4] *People v Ginther*, 390 Mich 436, 443; 212 NW2d 922 (1973).

Mich App 610, 613; 470 NW2d 475 (1991). Because defendant unexpectedly changed his mind about testifying, we conclude that defendant has not sustained his burden of showing that the performance of his counsel during voir dire was below an objective standard of reasonableness under prevailing professional norms.

Defendant also contends that his trial counsel was ineffective because he presented two conflicting defenses. We disagree. With defendant's belated decision to forgo testifying, counsel's original plan to present a self-defense theory was obviously weakened. Under the circumstances, counsel made the strategic decision to attempt to argue that the prosecution had not proved its case. The fact that defense counsel's strategy did not work does not establish ineffective assistance of counsel. See *People v Stewart (On Remand)*, 219 Mich App 38, 42; 555 NW2d 715 (1996).

We vacate the conviction of first-degree murder. The remaining convictions are affirmed. We remand for entry of a conviction of second-degree murder and for resentencing on that conviction and, because the trial court's sentence may have been influenced by the first-degree murder conviction, for resentencing on the assault with intent to commit murder conviction.