*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
April 10, 2025
Plaintiff-Appellee,
1:50 PM

v

No. 361493
Jackson Circuit Court
ZACHARIE SCOTT BORTON,
LC No. 21-002425-FC

Defendant-Appellant.

Before: GADOLA, C.J., and WALLACE and ACKERMAN, JJ.

PER CURIAM.

Defendant appeals of right his jury trial convictions of first-degree murder, MCL 750.316(1)(a); second-degree murder, MCL 750.317; possession of a firearm when committing a felony (felony-firearm), MCL 750.227b(1); and stealing a financial transaction device, MCL 750.157n(1). The trial court sentenced defendant as a fourth-offense habitual offender, MCL 769.12, to serve life imprisonment without the possibility of parole for the first-degree murder conviction, 40 to 80 months' imprisonment for the second-degree murder conviction, 34 to 180 months' imprisonment for the conviction of stealing the financial device of another, and a consecutive 5-year term of imprisonment for the felony-firearm conviction. We affirm.

## I. FACTS AND PROCEDURAL HISTORY

This case arises out of the shooting death of three men at a house in Grass Lake, Michigan. Michael Pauli owned the house and about 22 acres of surrounding land and lived with Edward Kantzler and Delmar Fraley. Paul Looker and Stacie Towner lived in a camper that they parked about 200 to 250 yards behind the house. Pauli and Kantzler were 70 years old, and Fraley was 80 years old, when they were shot to death during the early morning of August 22, 2021. Defendant was staying in Pauli's home, but immediately after the shooting, fled in Kantzler's vehicle, used Kantzler's debit card to buy gas, and stayed with a friend in Grand Rapids until police located and arrested him. Defendant admitted to law enforcement officers that he shot Pauli and Fraley, but he denied shooting Kantzler. Defendant maintained that he shot Pauli in self-defense

-1-

after Pauli pointed a gun and threatened to kill him and that he likewise shot Fraley in self-defense because he thought that Fraley had a weapon in his hand.

The prosecutor charged defendant with three counts of open murder, felony-firearm, carjacking, and stealing a financial device. The jury found that defendant committed the first-degree murder of Fraley and second-degree murder by shooting Pauli, but it could not reach a verdict on the charge of open murder in Kantzler's death. The jury also could not reach a verdict on the carjacking charge, and the trial court ultimately granted the prosecutor's motion for *nolle prosequi* on those charges.

Following his convictions and sentencing, defendant filed a claim of appeal and also moved to remand for an evidentiary hearing. The prosecutor agreed with defendant's motion, and this Court granted the motion to remand.[1] After an evidentiary hearing over two days, the trial court entered an order denying defendant's motion for a new trial.

## II. OTHER-ACTS EVIDENCE

Defendant first argues that the trial court erred by admitting evidence of two domestic incidents involving his wife. We agree, but conclude that defendant is not entitled to appellate relief.

We review a trial court's decision to admit evidence for an abuse of discretion. *People v Thorpe*, 504 Mich 230, 251; 934 NW2d 693 (2019). A trial court abuses its discretion when its decision falls outside the range of principled outcomes. *Id*. at 251-252. However, we will not set aside a verdict or grant a new trial because of evidence admitted in error unless it is more probable than not that the error resulted in a miscarriage of justice. *Id*., citing MCL 769.26.

The trial court ruled before the start of trial that the prosecutor could introduce evidence under MRE 404(b) that defendant rammed his wife's car while she was driving it and that he shot into the windows of her home in order to break in. At the time of defendant's trial, MRE 404(b)(1)[2] provided as follows:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

---

[1] *People v Borton*, unpublished order of the Court of Appeals, issued July 20, 2023 (Docket No. 361493).

[2] The Michigan Rules of Evidence were substantially amended on September 20, 2023, effective January 1, 2024. See ADM File No. 2021-10, 512 Mich lxiii (2023). We rely on the version of the rules in effect at the time of the trial court's order and defendant's trial.

As our Supreme Court explained in *People v VanderVliet*, 444 Mich 52, 55; 508 NW2d 114 (1993), amended 445 Mich 1205 (1994), to be admissible under MRE 404(b), evidence must meet the following requirements:

> First, that the evidence be offered for a proper purpose under Rule 404(b); second, that it be relevant under Rule 402 as enforced through Rule 104(b); third, that the probative value of the evidence is not substantially outweighed by unfair prejudice; fourth, that the trial court may, upon request, provide a limiting instruction to the jury.

The prosecutor sought to introduce evidence of defendant's conduct toward his wife to show intent, absence of mistake, defendant's knowledge of firearms, and to counter defendant's claim of self-defense. But a mere statement of a noncharacter purpose is not sufficient for the admission of the evidence, and "the prosecutor must explain how and demonstrate that the other-acts evidence is logically relevant to the stated purpose without relying on an impermissible propensity inference." *People v Galloway*, 335 Mich App 629, 638; 967 NW2d 908 (2020). To establish relevance, the prosecutor must show that the evidence is material and probative. *Id*. at 638-639. Accordingly, the evidence had to be related to a fact or issue of consequence in the case and make the fact more or less probable. *Id*. at 639.

Defendant is correct that the prosecutor failed to adequately show that defendant's conduct of bumping his wife's vehicle and shooting into the window of her house was relevant to an issue at defendant's trial. Defendant was apparently angry with his wife because she was granted custody of their child. It also appears that defendant was staying at Pauli's house to avoid arrest on the warrants arising out of the domestic-violence incidents. But nothing about his conduct toward his wife established identity, absence of mistake, or intent. Defendant did not claim, for example, that he was not at the scene of the crime or that he could not have shot the gun. Rather, defendant claimed that he shot Pauli in self-defense because Pauli pointed a gun and threatened to kill him. There was no allegation of self-defense in defendant's alleged crimes against his wife, and no evidence that he aimed a gun at or shot her. Rather, because of the dissimilarity between the crimes and the other acts, the evidence tended to only show that defendant had a propensity to act violently.

Although the prosecutor asserted that the other acts showed defendant's state of mind, this was true only to the extent that defendant tried to hide from authorities in both situations. Defendant hid at Pauli's house to avoid being arrested for domestic violence against his wife, and he hid at a friend's apartment to avoid arrest for the shooting at Pauli's house. But defendant did not dispute that he fled to avoid arrest in either case, so the other-acts evidence did not have any logical relevance to prove an issue at trial.

The prosecutor also asserted that the other acts showed defendant's knowledge of firearms; however, defendant readily admitted that he possessed the 40-caliber handgun for a long time and, considering the fact that defendant admitted to using the weapon to shoot two people and firing all of the bullets in the clip except for one, defendant's knowledge of firearms was not a disputed issue in this case.

Regarding the prosecutor's assertion that the other acts evidence countered plaintiff's claim of self-defense, nothing about the prior acts involving plaintiff's wife made his claim of self-defense more or less probable in this case. As defendant noted, the other-acts evidence "did not shed light on [defendant's] mindset during the charged off; [he] did not claim that he acted in self-defense during those altercations with his wife."

The prosecutor appears to agree that the evidence was inadmissible under MRE 404(b) because he argues for the first time on appeal that the evidence was admissible as other acts of domestic violence under MCL 768.27b(6)(a)(*i*). Indeed, the prosecutor urges us to affirm the trial court's admission of the evidence because it reached the correct result for the wrong reason. We decline to do so.

The prosecutor did not advance a theory of domestic violence to explain the shooting in Grass Lake and did not argue that, by shooting Pauli and Fraley while the men shared a residence, it constituted a crime involving domestic violence. Although defendant's conduct toward his wife showed a tendency to act violently toward an estranged family member, as defendant points out, it is unclear whether defendant staying at Pauli's house for about a week before the shooting would constitute a domestic situation or that the men would be members of the same household for purposes of MCL 768.27b(6)(a)(*i*). The prosecutor relies upon subpart (6)(b)(ii), which includes, within the definition of family or household member, "[a]n individual with whom the person resides or has resided."[3] But there is insufficient evidence here to determine that plaintiff was residing with any of the victims or that he resided with them in the past. At best, what was established at trial was that he spent short stints of time hiding from law enforcement at Pauli's house.

The prosecutor is correct that this Court will affirm a trial court's ruling if it reaches the correct result, but for the wrong reason. See *People v Lyon*, 227 Mich App 599, 612-613; 577 NW2d 124 (1998). But MCL 768.27b(1) does not permit any and all evidence of prior domestic violence in a trial involving domestic violence, instead it requires that the evidence be relevant to an issue at trial. For the reasons discussed, the dissimilarity between defendant's conduct toward his wife and the homicides in Grass Lake calls into question how the evidence would make any fact in issue more or less probable.

Nonetheless, defendant has not shown that the error in admitting the evidence was outcome-determinative. See MCL 769.26; *Thorpe*, 504 Mich at 252. Contrary to defendant's assertions, the evidence did not appear to influence the jury's verdict. The offer of evidence was brief, and the police witness did not give details about the incidents. Further, the jurors apparently reached different verdicts on each count of open murder, not because defendant committed other crimes, but on the basis of detailed evidence regarding the death of each victim.

The jury likely concluded that defendant committed the first-degree murder of Fraley because ample evidence showed that Fraley was elderly, sickly, weak, and unable to move with speed. Defendant admitted that Fraley did not actually have a weapon, and evidence showed that,

---

[3] We note that MCL 768.27b was recently amended, effective April 2, 2025; however, subpart (6)(b)(ii) was not amended, and the changes to that statute do not affect this case.

even after he eliminated any alleged threat, defendant continued to shoot Fraley while he was lying helpless on the ground. The jury concluded that defendant committed the second-degree murder of Pauli because he shot Pauli multiple times after Pauli allegedly stated, "I'm gonna kill you," but evidence suggested that Pauli was not carrying a weapon and only had a disposable lighter in his hand. The jury could not reach a verdict on Kantzler's death, although he too died of multiple gunshot wounds. Jurors may have disagreed about who caused Kantzler's death because he was shot outside the house with a different caliber gun than defendant used to shoot Pauli and Fraley. In each instance, it appears that the jury carefully considered what happened to each victim on the basis of the evidence related to their deaths.

There is no suggestion that evidence of defendant's prior conduct toward his wife had any bearing on the verdict, let alone that it was outcome-determinative. Accordingly, defendant is not entitled to a new trial on this ground.

## III. JURY VIEW

Defendant next argues that the trial court violated his right to participate in his trial by not allowing him to attend the jury view of the house where the shootings occurred. We disagree.

We review a trial court's decisions regarding a jury view for an abuse of discretion. *People v Herndon*, 246 Mich App 371, 418; 633 NW2d 376 (2001). Generally, a defendant has a right to be present during his trial. *People v Kammeraad*, 307 Mich App 98, 116; 858 NW2d 490 (2014). "[T]he test for whether defendant's absence from a part of his trial requires reversal of his conviction is whether there was any reasonable possibility that defendant was prejudiced by his absence." *People v Armstrong*, 212 Mich App 121, 129; 536 NW2d 789 (1995).

The prosecutor moved to allow the jury to view the crime scene, defense counsel stipulated to the motion, and the trial court granted it. The jury went to Pauli's property in Grass Lake before closing arguments, and it is undisputed that defense counsel attended the visit, but defendant did not.

We agree with the trial court's ruling on remand that, pursuant to our Supreme Court's decision in *People v Mallory*, 421 Mich 229, 248; 365 NW2d 673 (1984), because a defendant is entitled to be present for his trial, the trial court erred by excluding defendant from the jury view without defendant expressly waiving his right to attend. Contrary to defendant's assertions, however, our caselaw does not support the conclusion that a defendant's failure to appear for a jury view amounts to a structural error requiring reversal.

The United States Supreme Court has indicated that structural errors are intrinsically harmful, without regard to their effect on the outcome, so as to require automatic reversal. *Neder v United States*, 527 US 1, 8; 119 S Ct 1827; 144 L Ed 2d 35 (1999). But the Court also described the limited extent to which it has determined an error to be structural:

> Indeed, we have found an error to be "structural," and thus subject to automatic reversal, only in a "very limited class of cases." *Johnson v. United States*, 520 U.S. 461, 468, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997) (citing *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (complete denial of counsel); *Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927) (biased trial judge);

*Vasquez v. Hillery*, 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986) (racial discrimination in selection of grand jury); *McKaskle v. Wiggins*, 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984) (denial of self-representation at trial); *Waller v. Georgia*, 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984) (denial of public trial); *Sullivan v. Louisiana*, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993) (defective reasonable-doubt instruction)). [*Id*. at 8.]

Defendant has cited to no case in which an appellate court has held that a trial court's failure to have a defendant present for a jury view is a structural error requiring reversal absent waiver by the defendant.

As this Court has previously held, a defendant is entitled to relief on a claim related to his absence from a jury view only if "there is any reasonable possibility of prejudice," *People v King*, 210 Mich App 425, 433; 534 NW2d 534 (1995), and defendant has not made this showing. As defense counsel testified on remand, although defendant wanted the jury to see the close quarters in the house, defendant never expressed an interest in attending the site visit, he knew the area well, described the scene accurately to defense counsel, and there were also maps, photographs, and aerial views of the scene for him to assist in his defense. At the remand hearing, defense counsel stated that Detective Sergeant Bryan Huttenlocker gave the jury conflicting information about where the camper was parked on the property when the crime occurred. According to defense counsel, this could have impacted the jury's assessment of the evidence that the two people in the camper, Looker and Towner, could have heard one of the victims groaning or calling for help. However, as the trial court concluded, this error was corrected by counsel numerous times at the scene and on the record without the need for defendant's presence. Thus, because no evidence showed that defendant's absence from the jury view caused him prejudice, he has not established that he is entitled to a new trial. See *id*.

It also appears that, regardless of whether defendant should have been shackled in the courtroom (discussed next), more security would have been necessary at the jury view because it was in a very rural location, members of the victims' motorcycle club occupied the house at the time of trial, and the property abutted a heavily wooded area. As the trial court recognized, it would have been difficult to keep defendant, as well as the jurors, safe without additional security, and defendant was a known flight risk.[4] Defense counsel testified that he preferred that defendant not attend the jury view rather than allowing the jury to see defendant in prison garb or shackles, and defendant agreed.

---

[4] The trial court noted that, given the assertion of the violent nature of the surviving members of the subject club members or affiliates, and the rural setting with wooded areas, it might even have been irresponsible to assume the ability to protect defendant from sniper fire or ambush at the scene.

IV. SHACKLES IN COURTROOM

Defendant further asserts that he is entitled to a new trial because the trial court erroneously placed him in a leg iron clipped to a floor toggle after four days of trial. We disagree.

We review a trial court's decision to shackle a defendant at trial for an abuse of discretion. *People v Payne*, 285 Mich App 181, 186; 774 NW2d 714 (2009). "But even if a trial court abuses its discretion and requires a defendant to wear restraints, the defendant must show that he suffered prejudice as a result of the restraints to be entitled to relief." *Id.*

The trial court and the prosecutor agreed that the trial court erred by shackling defendant without first making "a finding supported by record evidence that shackling is necessary to prevent escape, injury to persons in the courtroom, or to maintain order." *People v Dunn*, 446 Mich 409, 411; 521 NW2d 255 (1994). The trial court made no such finding, but relied on a general concern, relayed to the attending deputy by his supervisor, that someone charged with three counts of open murder should be shackled. No evidence showed that defendant said or did anything during trial to justify the use of shackles, and it was error for the trial court to do so.

Again, however, defendant has not shown prejudice. The record reflects that the trial court and defense attorneys took pains to screen defendant's leg iron from view through the use of boxes to prevent jurors from seeing under the defense table from the jury box. Defendant also had the opportunity to establish this point on remand, but no juror stated that defendant's shackles were visible. Although one juror initially checked a box on a postcard suggesting that he could see defendant's shackles, when called by defense counsel's office and when testifying under oath, he denied seeing any leg iron on defendant. He asserted that he made a mistake on the postcard, and he further testified that he gave no consideration to whether defendant was shackled during deliberations.[5] Other jurors either did not respond to the postcard or reported that they did not see shackles on defendant. Although defendant's appellate counsel took pains to show that a person could theoretically see defendant's leg iron from various points in the courtroom, he did not show that the leg iron was actually visible to any of the jurors or that any juror actually saw the leg iron or considered the issue during their deliberations. Because no prejudice occurred, we decline to grant defendant's request for relief on this issue. See *Payne*, 285 Mich App at 186.

---

[5] Defendant argues that the juror committed perjury by denying that he saw defendant's leg irons, but this assertion was not established at the hearing on remand. The juror did not recall defendant standing as the jury entered and left the courtroom, but this fact alone did not show that he testified falsely about the leg irons. Again, when sworn by the court, the juror denied seeing defendant's leg irons. We also note that the post card was poorly worded. Instead of asking "during the trial of defendant Zacharie Borton, did you see Mr. Borton wearing shackles or leg irons," the question was, "[d]uring the trial of defendant Zacharie Borton, did you notice whether Mr. Borton was wearing shackles or leg irons?" It is undisputed that defendant did not wear leg irons during the first four days of trial. So, had the juror seen Mr. Borton during one of those days, and had the juror remembered that he was not wearing leg irons, answering "Yes" to that question may have simply communicated that the juror saw *whether* defendant was wearing leg irons – he was not.

## V. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant argues that defense counsel's failure to call a narcotics expert and an expert on outlaw motorcycle gangs denied him his right to the effective assistance of counsel. We disagree.

"The question whether defense counsel performed ineffectively is a mixed question of law and fact; this Court reviews for clear error the trial court's findings of fact and reviews de novo questions of constitutional law." *People v Trakhtenberg*, 493 Mich 38, 47; 826 NW2d 136 (2012).

> The Sixth Amendment of the United States Constitution states that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." See also Const 1963, art 1, § 20. "The right to counsel also encompasses the right to the effective assistance of counsel." *People v Pubrat*, 451 Mich 589, 594; 548 NW2d 595 (1996).

> "To establish ineffective assistance of counsel, defendant must first show that (1) his trial counsel's performance fell below an objective standard of reasonableness under the prevailing professional norms, and (2) there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different." *People v Uphaus (On Remand)*, 278 Mich App 174, 185; 748 NW2d 899 (2008). "Effective assistance of counsel is presumed and defendant bears the burden of proving otherwise." [*People v*] *Petri*, 279 Mich App [407, 410; 760 NW2d 882 (2008)]. [*In re LT*, 342 Mich App 126, 133-134; 992 NW2d 903 (2022). See also *Strickland v Washington*, 466 US 668, 688; 104 S Ct 2052; 80 L Ed 2d 674 (1984).]

## A. NARCOTICS EXPERT

Defendant maintains that defense counsel should have called a narcotics expert to testify that the combination of drugs, particularly in Pauli's system, would have caused him to act aggressively and irrationally on the night of the crime. The record reflects that Pauli's postmortem toxicology report showed that he ingested cocaine, methamphetamine, fentanyl, and amphetamine before he died.

On remand, defense counsel testified that he spoke to a doctor from Wayne State University about the combination of drugs in the victims, including the fact that they could cause an amplification of violent or emotional responses in people who were given to such tendencies, but he decided not to call him as a witness at trial because defendant also used methamphetamine. Defense counsel was concerned that the testimony would establish that defendant also likely behaved more aggressively when he shot Pauli and Fraley. This would have undermined defendant's claim that he acted in self-defense when Pauli confronted him. In his postremand brief, defendant states that a toxicology report showed that he did not have drugs in his system, but this appears to be a misstatement of fact. Instead, law enforcement officers opted not to give defendant a drug test because he surrendered about 48 hours after the crime occurred and they did not believe that the tests could accurately show the drugs in defendant's system on the night of the shooting. Evidence instead showed that defendant told law enforcement officers that both he and Pauli used methamphetamine.

-8-

Although defendant argues that the jury needed to be educated about the effects of a drug like methamphetamine, the jury learned through Detective Sergeant Huttenlocker that cocaine, fentanyl, and methamphetamine can cause hallucinations, aggressive behavior, and irrational reactions, which is what defendant's expert on remand confirmed. Defendant's expert also conceded that, if defendant had been using methamphetamine at the time of the subject incident, it would have contributed to him being more aggressive.

Under the circumstances, it was a reasonable strategic decision by defense counsel to highlight the effect that the drugs may have had on the victims through Detective Sergeant Huttenlocker's testimony, while preventing additional testimony about the effect that methamphetamine may have had on defendant's conduct. Defense counsel fulfilled his duty to reasonably investigate issues related to drug use, see *Trakhtenberg*, 493 Mich at 52, and used his professional judgment not to call a narcotics expert at trial. "This Court does not second-guess counsel on matters of trial strategy, nor does it assess counsel's competence with the benefit of hindsight." *People v Traver*, 328 Mich App 418, 422-423; 937 NW2d 398 (2019) (quotation marks and citation omitted).

## B. OUTLAW MOTORCYCLE GANG EXPERT

Defendant further asserts that defense counsel was ineffective for failing to consult with, and call, an expert on outlaw motorcycle gangs at trial.

The victims were members of a specific motorcycle club (the subject club). On remand, defendant introduced the testimony of Christopher Omodt, who worked as a police officer investigating outlaw biker gangs from 1997 to 2005 in Minnesota. Omodt testified that outlaw motorcycle gangs are criminal organizations that use violence and intimidation. Guns and other weapons are also "very prevalent" among gang members, although many active members (e.g., those with felony records) do not generally keep guns in their homes (he said, in those cases, they usually store guns at the house of an associate). Omodt testified that he did not study any outlaw motorcycle gangs in Michigan or the subject club specifically, but he testified that the subject club is considered an outlaw gang.

Defense counsel testified on remand that he was very familiar with outlaw motorcycle gangs before trial because he investigated them as a police officer in Florida and North Carolina. Defense counsel maintained that he did not consider talking to an expert about outlaw motorcycle gangs before trial because he thought that the evidence established the environment in which the victims lived. He also mentioned that he was not sure he would have found someone who could have testified about the subject club specifically. Defense counsel also testified that, from his investigation, the victims were not in active leadership roles in the motorcycle gang, which made the issue less relevant. He further noted that someone within the subject club directed Pauli to take defendant into his home. Defense counsel further observed that, because of their ages and poor health, Pauli, Fraley, and Kantzler were not as active in the motorcycle club as they may have been when they were younger.

Under these circumstances, defense counsel's decision not to call an expert on this issue did not fall below an objective standard of reasonableness under prevailing professional norms, and it did not prejudice defendant's trial. Defense counsel knew about motorcycle gangs, and he

elicited testimony that the victims engaged in drug use and commonly used guns. Although outlaw gangs may have a propensity for violence, defendant was also either associated with the subject club or under the protection of someone in the subject club. Therefore, the expert testimony would arguably have highlighted defendant's affiliation with the gang as much as it would the victims'.

Further, much of Omodt's testimony about gang members did not appear relevant to these victims. Omondt admitted that he had never investigated the subject club. Additionally, Omodt made clear that it would be very unusual for men in their 70s and 80s to be active members of an outlaw gang. He also testified that it would be very unusual for members of an outlaw gang to have guns out in the open in their homes as the men did in this case. Defendant's point appears to be that Omodt's testimony would have established that Pauli, Kantzler, and Fraley were likely violent men, but ample other evidence showed that the victims owned guns and other weapons and that they regularly used drugs and associated with other drug users and people who committed crimes. Defense counsel testified that he believed that evidence established the characters and personalities of the victims. Thus, Omodt's testimony in that regard would have been cumulative. For these reasons, we find that defendant has failed to show that the lack of specific evidence about the subject club's organization prejudiced him at trial.

## VI. SUFFICIENCY OF THE EVIDENCE

Defendant further claims that the prosecutor presented insufficient evidence to support the jury's verdict that defendant committed the first-degree murder of Fraley. We disagree.

We review a challenge to the sufficiency of the evidence by examining the "record evidence de novo in the light most favorable to the prosecution to determine whether a rational trier of fact could have found that the essential elements of the crime were proved beyond a reasonable doubt." *People v Roper*, 286 Mich App 77, 83; 777 NW2d 483 (2009). The elements of first-degree murder under MCL 750.316(1)(a) are the intentional killing of a human with premeditation and deliberation. *People v Bass*, 317 Mich App 241, 265-266; 893 NW2d 140 (2016).

> "To premeditate is to think about beforehand; to deliberate is to measure and evaluate the major facets of a choice or problem." *People v Plummer*, 229 Mich App 293, 300; 581 NW2d 753 (1998) (quotation marks and citation omitted). "Premeditation and deliberation may be inferred from all the facts and circumstances, but the inferences must have support in the record and cannot be arrived at by mere speculation." *Id*. at 301. "Though not exclusive, factors that may be considered to establish premeditation include the following: (1) the previous relationship between the defendant and the victim; (2) the defendant's actions before and after the crime; and (3) the circumstances of the killing itself, including the weapon used and the location of the wounds inflicted." *Id*. at 300. [*Bass*, 317 Mich App at 266.]

We hold that the evidence was sufficient for the jury to decide that it fairly supported an inference of premeditation and deliberation. See *People v Oros*, 502 Mich 229, 241-242; 917 NW2d 559 (2018). Although defendant took the position that Fraley snuck up on him after defendant killed Pauli, and that defendant thought that Fraley had something shiny in his hand, the

evidence adduced at trial did not support this theory. One witness testified that he heard a round of gunshots, and then, within about 30 seconds to a minute, he heard a second round of shots. Another witness estimated that the shootings all occurred within a period of 10 or 15 minutes. Evidence also showed, and defendant conceded, that Fraley did not actually have a weapon when defendant shot him. Further, no evidence showed that any other weapon was used inside the house when Pauli and Fraley were shot and killed.

Trial testimony showed that Fraley, at 80 years old, was in a state of very poor health. He had both Parkinson's disease and severe chronic obstructive pulmonary disease. Fraley walked by slowly shuffling his feet, he shook uncontrollably, he had to use one hand to hold up his pants as he walked because he was so thin, and he could not take care of basic daily needs. Evidence showed that Fraley could not open jars or light a cigarette, he would spill anything he tried to pour, and he needed use a straw to drink because of his tremors. Viewing the evidence in a light most favorable to the prosecutor, under the circumstances, it was unlikely that the jury believed that defendant feared Fraley would harm him—with or without a weapon—when defendant shot Fraley.

Evidence also showed that defendant was more than two feet away from Fraley when he shot him and that some shots were plainly fired in a downward trajectory. This evidence established that defendant shot Fraley at least two or three times when Fraley was lying on the ground. This was also supported by evidence that bullets were found underneath Fraley's body and another bullet was found in the basement of the house.

Premeditation and deliberation may be established by an interval of time, like the 30 seconds to a minute between the shooting of Pauli and Fraley. See *Oros*, 502 Mich at 242. Alternatively, if there was evidence to show that defendant had sufficient time to take a second look, then the amount of time may be a brief moment or mere seconds. See *id*. at 242-243. The crime in this case occurred when only four men were in the house. Even if Fraley were able to "sneak up" on him, defendant was well aware that Fraley slept in the living room and that he would have been the only other person on the main floor of the house.

Further, even if the jury believed defendant's claim that Fraley held something shiny that could have been a weapon, it would have been unreasonable for defendant to view Fraley as a threat. Fraley was too weak and unstable to even make a lighter work; therefore, even if Fraley held a gun pointed in defendant's direction, it was unlikely that he would be able to aim it and pull the trigger. Regardless, defendant admitted that Fraley was unarmed. The jury could have reasonably found that defendant had time to discern these circumstances before shooting Fraley at the outset. Moreover, defendant had time enough and information to realize that any potential threat by Fraley was dispelled once Fraley fell to the ground. That defendant shot Fraley repeatedly from a distance as Fraley was lying on the ground shows that his actions were knowing and deliberate.

Evidence after the crime also showed that, rather than contacting emergency medical services or the police after responding to a threat in self-defense, defendant fled from the scene, he tried to sell one of the weapons, and he tried to find a place to hide. He told his friend that he "did something dumb" and something he was "not very proud of." This evidence suggests that defendant intentionally killed Fraley knowing that Fraley had no weapon or physical ability to

defend himself. This evidence was sufficient for the jury to infer that defendant killed Fraley with premeditation and deliberation, and he is not entitled to relief on this claim.

## VII. JURY INSTRUCTION ON MALICE

Defendant argues that the trial court erred by failing to instruct the jury that the prosecutor had to prove malice beyond a reasonable doubt to find that defendant committed second-degree murder. Alternatively, he argues that defense counsel's failure to ask for the instruction deprived him of his right to the effective assistance of counsel. We disagree.

Defendant did not preserve his instructional challenge by objecting in the trial court, and we review the issue for plain error affecting defendant's substantial rights. See *People v Kowalski*, 489 Mich 488, 505-506; 803 NW2d 200 (2011). Defendant did preserve his claim of ineffective assistance of counsel, though, by moving for remand. Again, we review the trial court's findings of fact for clear error and questions of law de novo. See *Trakhtenberg*, 493 Mich at 47.

"A criminal defendant is entitled to have a properly instructed jury consider the evidence against him." *People v Riddle*, 467 Mich 116, 124; 649 NW2d 30 (2002). "The jury instructions must include all elements of the crime charged, and must not exclude from jury consideration material issues, defenses or theories if there is evidence to support them." *People v Armstrong*, 305 Mich App 230, 240; 851 NW2d 856 (2014) (quotation marks and citation omitted).

Defendant maintains that, pursuant to *Mullaney v Wilbur*, 421 US 684; 95 S Ct 1881; 44 L Ed 2d 508 (1975), the trial court was obligated to instruct the jury that, to prove malice for purposes of second-degree murder, the prosecutor had to disprove provocation beyond a reasonable doubt. In *Mullaney*, the United States Supreme Court ruled that Maine's statutory scheme for murder was unconstitutional because it impermissibly placed the burden on the defendant to prove that the killing occurred in the heat of passion on sudden provocation. *Id*. at 703-704.

In Michigan, "[t]he elements of second-degree murder are (1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without justification or excuse." *People v Wafer*, 509 Mich 31, 40; 983 NW2d 315 (2022) (quotation marks and citation omitted). Contrary to defendant's arguments, the trial court did not instruct the jury in a manner that shifted the burden to defendant to prove that he acted without malice. Although the trial court did not use the word "malice" in the jury instruction, in Michigan, malice is defined as "the intent to kill, the intent to cause great bodily harm, or the intent to do an act in wanton and willful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm." *People v Goecke*, 456 Mich 442, 464; 579 NW2d 868 (1998). The trial court correctly instructed the jury that, to convict defendant of second-degree murder, the prosecutor had to prove "he intended to kill or he intended to do great bodily harm to Michael Pauli . . . or he knowingly created a very high risk of death or great bodily harm knowing that death or such harm . . . would be the likely result of his actions."

Because defendant presented evidence that he was provoked when Pauli threatened to kill him, the trial court also instructed the jury on manslaughter. The trial court correctly instructed the jury that, if defendant acted while disturbed by emotional excitement to the point that a reasonable person might have acted on impulse without thinking twice from passion instead of

judgment, and the killing resulted from that excitement, then the jury should find that defendant committed manslaughter.

At no point did the trial court shift the burden of proof to defendant to negate any presumed or implied element as in *Mullaney*. Instead, the trial court instructed the jury that, to convict defendant of second-degree murder, it must find that the prosecutor proved all elements of the crime beyond a reasonable doubt.

Because the trial court instructed the jury on all elements of the crimes and did not impermissibly shift the burden of proof to defendant, no instructional error occurred. Further, counsel is not ineffective for failing to raise a meritless argument or futile objection. See *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010). For the reasons stated, defendant has not shown any error to support his request for a new trial.

Affirmed.

/s/ Michael F. Gadola
/s/ Randy J. Wallace
/s/ Matthew S. Ackerman