*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

STEPHEN JEROME PRUITT,

        Defendant-Appellant.

UNPUBLISHED
August 25, 2025
10:42 AM

No. 367977
Wayne Circuit Court
LC No. 2020-004455-02-FC

---

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

TIMOTHY PAUL BENNETT,

        Defendant-Appellant.

No. 368101
Wayne Circuit Court
LC No. 2020-004455-01-FC

---

Before: REDFORD, P.J., and RIORDAN and BAZZI, JJ.

PER CURIAM.

These consolidated appeals[1] arise from the July 16, 2020 shooting in a liquor store in Dearborn, Michigan, that resulted in the death of Daven Robinson and the wounding of Darnell Young. The codefendants were tried together before separate juries.

In Docket No. 367977, defendant Stephen Pruitt appeals as of right his jury trial convictions for one count of first-degree murder, MCL 750.316(1)(a), one count of assault with

---

[1] *People v Pruitt*, unpublished order of the Court of Appeals, entered October 17, 2023 (Docket Nos. 367977 and 368101).

intent to murder (AWIM), MCL 750.83, one count of felon in possession of a firearm (felon-in-possession), MCL 750.224f, and three counts of carrying a firearm during the commission of a felony (felony-firearm), MCL 750.227b. Pruitt was sentenced as a fourth-offense habitual offender, MCL 769.12, to concurrent terms of life without parole for first-degree murder, 30 to 60 years' incarceration for AWIM, and four to five years' incarceration for felon-in-possession, all to be served consecutively to a term of two years' incarceration for each felony-firearm conviction.

In Docket No. 368101, defendant Timothy Bennett appeals as of right his jury trial convictions for one count of first-degree murder, one count of AWIM, one count of felon-in-possession, three counts of felonious assault, MCL 750.82, and six counts of felony-firearm. Bennett was sentenced as a fourth-offense habitual offender, to concurrent terms of life without parole for first-degree murder, 30 to 60 years' incarceration for AWIM, 3 to 15 years' incarceration felon-in-possession, and 5 to 15 years' incarceration for each felonious assault conviction, all to be served consecutively to a term of two years' incarceration for each felony-firearm conviction. For the reasons set forth below we affirm both defendants' convictions and the sentences imposed.

## I. BASIC FACTS AND PROCEDURAL BACKGROUND

## A. EVENTS SURROUNDING JULY 16, 2020 SHOOTING

Both defendants, who are cousins, were tried for acts they allegedly committed on July 16, 2020, at the Five Star Liquor Store located in Dearborn, Michigan. On that evening, the complainants Robinson and Young, along with their friends Deon Hunter, Doctory Young (Doc), "Duke," Santwaun Davis, and Dasiray Cooper walked to the store. Shortly after, defendants arrived at the store in a white Chevy Cruze.[2] Both defendants had firearms and secured them in their respective pockets after getting out of the vehicle.

After defendants entered the store, Pruitt stayed near the front doors, and Bennett pulled out his gun and approached Hunter. While waiving his firearm around, Bennett kept asking something to the effect of, "[Why] y'all busting at me every time you see me[?]" Bennett, who testified on his own behalf at trial, explained that "busting at me" meant "shooting me" or "hunting me." Bennett and Pruitt testified that Hunter and Robinson were part of the "Joy Road Mob" and that group had a history of trying to kill them. In response to Bennett's repeated questioning, Hunter replied, along the lines of, "to keep it like that," which Bennett understood to mean that Hunter and his group did not intend to stop "busting" at them in the future.

Shortly thereafter, Bennett raised his gun, pointed the firearm toward the front doors, and yelled to Pruitt, "Don't let no ni**a out that door, cuz!"[3] Although Pruitt testified that he did not hear Bennett's directive, he nonetheless moved in front of the right doors. Robinson, from about

---

[2] Bennett was driving the vehicle, which was owned by Alicia Roberts, who was Bennett's girlfriend at the time. Although not pertinent, a third person named Mohammed was in the vehicle as well.

[3] At some point, Bennett allowed two other unknown individuals to leave the store.

-2-

15 to 20 feet away, then rushed toward the front doors. Pruitt pulled his gun from his pocket and shot Robinson in the head. Young, who had been standing near the front doors somehow stumbled over Robinson when Robinson was shot and fell to the ground. Young landed nearly on top of Robinson, lying face down, when Pruitt shot Young in the back. After each time Pruitt fired his gun, Bennett said, "Yea, ni**a." Pruitt and Bennett then left the store. But before doing so, Bennett told the store clerk to "get rid of" any surveillance footage and told Doc "yeah, bro, yeah."[4]

Young survived the shooting, but he passed away of unrelated, natural causes before trial. Robinson, however, died. The medical examiner testified that the gunshot entered Robinson's face, just below his right eye, and exited the left side of his rear neck, causing his death. The parties stipulated that for purposes of the felon-in-possession charges, defendants both had been convicted of a specified felony and defendants did not have the right to possess firearms. Pruitt was charged as the principal in the murder of Robinson and the AWIM of Young, while Bennett was charged under an aider and abettor theory for those offenses.

## B. OTHER PROCEDURAL HISTORY

On July 28, 2023, the juries started their deliberations in the afternoon. The juries did not reach a verdict that day and they returned on July 31, 2023, to continue deliberating. On July 31, 2023, the Bennett jury submitted a question to the trial court asking, "Does Bennett have to be first-degree if we think Pruitt deserves first-degree?" The court indicated that it simply was going to re-read the aiding and abetting instruction to the jury. Defense counsel had no objection, but later she stated, "In addition to reading the aiding and abetting, would the Court be opposed to reading the mere presence as well for them?" The trial court denied the request, noting that the jury was not asking about "mere presence," rather, the jury was only asking about "aiding and abetting."

Both juries returned guilty verdicts as previously described, with Bennett's jury rendering its verdict first.[5] After the Pruitt jury issued its verdict, the trial court stated the following:

> But the Court wants to put something on the record. I wanted [Bennett's] counsel here. I guess I was trying to wait but I can always do it before sentencing.
>
> Over the weekend, after everything was done with this trial, I—my sister was in town and we had a brunch. And at that time, because I had not been available for two weeks, everybody started to ask me about the trial. Since the trial was over, you know, I started telling them about the trial.

---

[4] The prosecutor maintained that the video depicts Bennett actually saying, "dead, bro, dead," but our review of the recording says otherwise.

[5] Both defendant's first-degree murder convictions related to the death of Robinson, and their AWIM convictions pertain to the assault of Young. Bennett's felonious assault convictions were on the basis of his alleged conduct toward Hunter, Cooper, and Davis.

Well, come to find out that Mr. Daven Robinson is a distant relative of my husband, which I did not know at the time of the trial. But I wanted to make sure that I put that on the record because I had not—you know, I've only been married almost two years. I was not aware that Mr. Robinson was connected to my husband.

I also had not looked out into the audience to see. Which I don't really know their family except for his first cousin, who I never noticed was in the courtroom, who, I think, might be in the courtroom now.

Is that correct?

Pam. Yes, I do know Pam.

But I had not seen her before today actually.

So I just wanted to make the record clear that I was not aware that Mr. Daven Robinson is a distant relative of my husband. He's the grandson of my husband's first cousin or something like that.

When I found out, I asked my husband. He doesn't know him or anything. So I didn't know him.

The following day, the trial court summoned Bennett to appear. The court largely reiterated what it had presented to Pruitt:

The reason I called you back—I actually had sent a message to have you come back on—I had to wait until [Pruitt's] jury came back and they came back, like an hour after you. And I asked [the prosecutor] to call you back but I know you may have not been able to return. So I wanted to make sure I did this as soon as possible.

After the trial was over and after the jury had it already, on Sunday I found out that Mr. Daven Robinson is a distant relative of my husband, which I was not aware of. So I wanted to make sure that there is a record of that. Distant as in my husband does not know him, because I asked. He also does not know his mother. But my husband is one of thirteen and this is a cousin's grandson or something along those lines.

And so I wanted to make a record that during the trial I was not aware. And I didn't really pay attention to people out in the gallery but I also didn't—I don't know his family so I would not have known this anyway.

However, at the sentencing [sic–verdict], there was a cousin. So Daven Robinson's grandfather, a guy named Tony Robinson, who has since deceased[,] [h]e has a sister named Pam. Pam I do know. But I did not see her during the trial.

So I wanted to make sure the record was clear that the Court was not aware that there was any connection with it and Mr. Robinson but I still wanted to put it

-4-

on the record that I subsequently learned after the trial was over that he is a distant relative of my husband, who I have not been married to for two years yet so I don't know his family like that outside of his immediate family.

On August 11, 2023, Bennett and Pruitt jointly moved to disqualify the trial court judge and for a new trial. Defendants argued that the judge's relationship with Robinson gives rise to an appearance of impropriety. Immediately preceding Pruitt's sentencing, the trial court held a hearing on the motion. Bennett's counsel stated:

Judge, for the purposes of today's motion hearing, um, the defense is prepared to stand on their brief, just making mention of the fact, again, as it was included in the brief, that if the Court is not willing to recuse themselves in this matter we would ask that it be heard by the Chief Judge.

Pruitt's counsel concurred with the position taken by Bennett's counsel.

The trial court denied the motion. The trial judge reiterated that it had "no idea that Mr. Robinson was connected to my husband in any way. My husband does not know him. Neither does he know his parent." The judge noted that "Robinson" is a very common name and it had no reason to suspect that there was a familial relationship between her husband and Robinson. Further, the trial judge stressed that the case was concluded by the time it learned of the relationship, with the only thing remaining was sentencing, which included nondiscretionary, statutorily mandated sentences of life without parole.

## II. SUFFICIENCY OF THE EVIDENCE

Both defendants raise various arguments related to the sufficiency of the evidence. A challenge to the sufficiency of the evidence is reviewed de novo and in a light most favorable to the prosecution to determine "whether any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt." *People v Cline*, 276 Mich App 634, 642; 741 NW2d 563 (2007). "All conflicts with regard to the evidence must be resolved in favor of the prosecution. Circumstantial evidence and reasonable inferences drawn from it may be sufficient to prove the elements of the crime." *People v Wilkens*, 267 Mich App 728, 738; 705 NW2d 728 (2005) (citation omitted).

First, defendants argue that there was insufficient evidence to show Pruitt possessed the requisite intent to be convicted of first-degree murder. Notably, for both defendants, the prosecution had to prove that Pruitt committed first-degree premeditated murder. That is because even under the aiding and abetting theory for Bennett, the prosecution had to prove that the first-degree murder offense was perpetrated by him or "some other person." *People v Jackson*, 292 Mich App 583, 589; 808 NW2d 541 (2011).

"To establish first-degree premeditated murder, the prosecutor must prove that the defendant intentionally killed the victim with premeditation and deliberation." *People v Taylor*, 275 Mich App 177, 179; 737 NW2d 790 (2007). Both defendants do not contest that there was sufficient evidence to show that Pruitt intentionally killed Robinson and instead aver that there was insufficient evidence to establish the premeditation and deliberation elements.

"Since the distinguishing elements of first-degree murder ultimately resolve themselves into questions of fact, minimum standards of proof, if reasonably related to the circumstances which must be proved, will serve to preserve the distinction between first-degree and second-degree murder." *People v Oros*, 502 Mich 229, 241; 917 NW2d 559 (2018) (quotation marks and citation omitted); see also *People v McGhee*, 268 Mich App 600, 623; 709 NW2d 595 (2005) (stating, "Because it is difficult to prove an actor's state of mind, only minimal circumstantial evidence is required"). "[W]hen considering a sufficiency-of-the-evidence issue, the question is whether the evidence introduced at the trial fairly supports an inference of premeditation and deliberation." *Oros*, 502 Mich at 242 (quotation marks, citation, and brackets omitted).

Premeditation and deliberation require sufficient time to allow the defendant to reconsider his actions, or stated differently, sufficient time to "take a second look." *People v Abraham*, 234 Mich App 640, 656; 599 NW2d 736 (1999). "That is, some time span between the initial homicidal intent and ultimate action is necessary to establish premeditation and deliberation, but it is within the province of the fact-finder to determine whether there was sufficient time for a reasonable person to subject his or her action to a second look." *Oros*, 502 Mich at 242 (quotation marks and citation omitted). "While the minimum time necessary to exercise this process is incapable of exact determination, it is often said that premeditation and deliberation require only a brief moment of thought or a matter of seconds." *Id*. at 242-243 (quotation marks, citations, and brackets omitted).

"The requisite state of mind may be inferred from defendant's conduct judged in light of the circumstances." *Id*. at 243 (quotation marks and citation omitted). "In other words, what constitutes sufficient evidence to support the elements of premeditation and deliberation may vary from case to case because the factual circumstances will vary, but the ultimate answer may be resolved in determining whether reasonable inferences may be made to support the fact-finder's verdict." *Id*. at 243-244. Nonexclusive factors that may be considered to establish premeditation include (1) the prior relationship between the defendant and the complainant, (2) the defendant's actions before and after the offense, and (3) the circumstances surrounding the killing, including the weapon used and the location of the wounds inflicted. *People v Plummer*, 229 Mich App 293, 300-301; 581 NW2d 753 (1998). Although premeditation and deliberation may be inferred by the fact-finder, the inferences must be supported by the evidence and cannot be on the basis of speculation. *Id*. at 301.

There was sufficient evidence to support Pruitt's conviction of first-degree murder. The jury may have inferred from the evidence that once Bennett instructed Pruitt to not let anyone out of the store, Pruitt formed the intent to kill if any of the "Joy Road Mob" attempted to leave. This inference is supported by the evidence presented that immediately after Bennett states, "Don't let no ni**a out that door, cuz!" Pruitt moved to block the front doors, which typically serve as the store exit, and did so while reaching into his pocket, with his hand on his gun. In essence, the jury may have found that Pruitt was "lying in wait" for the next person who tried to leave the premises. The approximate 12 seconds between when Pruitt was instructed not let anyone out, at which point a jury could reasonably conclude he formed the initial intent to kill, and when Pruitt shot Robinson was sufficient to allow the jury to find that he acted with premeditation and deliberation. See *Oros*, 502 Mich at 242-243 (stating that "a matter of seconds" can be adequate to take a second look). Consequently, viewing the evidence in a light most favorable to the prosecution, there was sufficient evidence to support Pruitt's conviction of first-degree murder.

Pruitt further argues that there was insufficient evidence to demonstrate that he intended to kill Young. The elements of AWIM include the following: "(1) an assault, (2) with an actual intent to kill, (3) which successful, would make the killing murder." *People v Ericksen*, 288 Mich App 192, 195-196; 793 NW2d 120 (2010). There was sufficient evidence to substantiate the jury's finding that Pruitt intended to kill Young. Pruitt's use of a firearm on Young, by itself, is sufficient to support such a finding. See *People v Carines*, 460 Mich 750, 759; 597 NW2d 130 (1999) (providing, "Malice may also be inferred from the use of a deadly weapon"). Additionally, this case does not involve an allegation of an accidental shooting. After shooting Robinson in the face while Robinson was running toward Pruitt, Pruitt then aimed the gun down and deliberately shot Young, who had tripped over the fallen Robinson, in the back. These circumstances clearly permit an inference of an intent to kill on Pruitt's part.

Lastly, Bennett argues that there was insufficient evidence to establish that he specifically intended for Pruitt to commit first-degree murder and AWIM. To prove that a defendant aided and abetted the commission of an offense, the prosecution must establish the following:

> (1) the crime charged was committed by the defendant or some other person, (2) the defendant performed acts or gave encouragement that assisted the commission of the crim, and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time he gave aid and encouragement. [*Jackson*, 292 Mich App at 589 (quotation marks and citation omitted).]

Bennett's challenge relates to the third element.

The evidence was sufficient to allow the jury to conclude that Bennett intended the commission of the subject offenses. Given his instruction to Pruitt to bar anyone from leaving the premises, the jury could infer that Bennett was expressly intending for Pruitt to plan to shoot any person attempting to exit. This is not mere speculation. Bennett was aware that Pruitt was carrying a firearm. Bennett further knew that Pruitt used a cane and had significant mobility issues resulting from a recent foot amputation. The jury could infer that, with this knowledge, Bennett recognized that the only means for Pruitt to stop persons from leaving the store was to shoot them with his gun. This minimal circumstantial evidence is sufficient to establish the requisite intent for aiding and abetting the offenses of first-degree murder and AWIM. See *Oros*, 502 Mich at 241; *McGhee*, 268 Mich App at 623.

## III. JUDICIAL DISQUALIFICATION

Defendants argue that the trial court erred by denying their motion to disqualify. We disagree.

### A. PRESERVATION

We first address whether this issue is preserved. To preserve a judicial disqualification issue for appellate review, a defendant must first move for disqualification before the challenged judge and, if the motion is denied, request referral to the chief judge of the circuit court for review of the motion de novo. MCR 2.003(D)(3)(a)(i); *Sinicropi v Mazurek*, 273 Mich App 149, 176 n

15; 729 NW2d 256 (2006). However, the court rule and caselaw also require the motion to disqualify be accompanied by an affidavit. MCR 2.003(D)(2); *Cain v Dep't of Corrections*, 451 Mich 470, 494; 548 NW2d 210 (1996). In this instance, no such affidavit was submitted with the motion to disqualify. Accordingly, there is no question that MCR 2.003(D)(2)'s mandate was not satisfied, and the issue is not preserved.[6]

Additionally, it is doubtful that defendants' preemptory request to have the motion decided by the chief judge satisfies the preservation requirement. The request for a referral to the chief judge is to occur "*after* the trial judge denie[s] the motion for disqualification." *Sinicropi*, 273 Mich App at 176 n 15 (emphasis added); MCR 2.003(D)(3)(a)(ii). In this instance, neither defendant, after the motion was denied, requested the chief judge to review the matter. The request came *before* the trial court's ruling. While one may question why it matters when the request is made, we suggest that it needs to be after the court makes its ruling, so the aggrieved party knows the basis for the denial. Otherwise, every party seeking a disqualification of a judge could just add boilerplate language to its motion seeking a referral in the event the motion ultimately is denied and ostensibly satisfy the court rule without knowledge of the court's reasons for denying the motion. See *People v Aceval*, 486 Mich 887, 890 n 1; 781 NW2d 779 (2010) (separate statement by Justice MARKMAN) (noting that MCR 2.003 requires the request for referral be made *after* the motion has been denied).[7]

## B. STANDARD FOR REVIEW

Generally, a trial court's findings of fact related to a motion for disqualification are reviewed for an abuse of discretion, and its application of the facts to the relevant law is reviewed de novo. *People v Wells*, 238 Mich App 383, 391; 605 NW2d 374 (1999). However, unpreserved issues are reviewed for plain error affecting substantial rights. *People v Jackson*, 292 Mich App 583, 592; 808 NW2d 541 (2011). "Under the plain-error rule, defendant bears the burden to prove (1) an error occurred, (2) the error was plain, i.e., clear or obvious, and (3) the plain error affected substantial rights, i.e., prejudiced defendant by affecting the outcome of the proceedings." *People v Anderson*, 341 Mich App 272, 279-280; 989 NW2d 832 (2022) (quotation marks and citations omitted). Even if satisfied, reversal still is not warranted unless "the plain error seriously affected

---

[6] MCR 2.003(D)(2) plainly states that "[a]n affidavit must accompany the motion." The court rule is clear, and its use of the word "shall" denotes mandatory compliance. See *People v Lockridge*, 498 Mich 358, 387; 870 NW2d 502 (2015) (providing, "As we have stated many times, 'shall' indicates a *mandatory* directive").

[7] Justice MARKMAN's statement that any request for a referral has to come after the motion is denied by the targeted justice was in the context of MCR 2.003(D)(3)(b). That provision states, "If the challenged justice denies the motion for disqualification, a party may move for the motion to be decided by the entire Court." This is similar to MCR 2.003(D)(3)(a)(i), which deals with other courts and provides, "If the challenged judge denies the motion, . . . on the request of a party, the challenged judge shall refer the motion to the chief judge." Both versions are crafted in a similar manner with the condition, "if the challenged judge/justice denied the motion." It is only after this condition is satisfied that a party gets to request further review.

the fairness, integrity, or public reputation of the judicial proceedings independent of defendant's innocence." *Id*. at 380.

## C. ANALYSIS

Defendants cited MCR 2.003(C)(1)(b) and (g) as grounds for the trial judge's disqualification. Those provisions provide:

> (1) Disqualification of a judge is warranted for reasons that include, but are not limited to, the following:
>
> * * *
>
> (b) The judge, based on objective and reasonable perceptions, has either (i) a serious risk of actual bias impacting the due process rights of a party as enunciated in *Caperton v Massey*, [556 US 868]; 129 S Ct 2252; 173 L Ed 2d 1208 (2009), or (ii) has failed to adhere to the appearance of impropriety standard set forth in Canon 2 of the Michigan Code of Judicial Conduct.[8]
>
> * * *
>
> (g) The judge or the judge's spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:
>
> (i) is a party to the proceeding, or an officer, director, or trustee of a party;
>
> (ii) is acting as a lawyer in the proceeding;
>
> (iii) is known by the judge to have a more than de minimis interest that could be substantially affected by the proceeding;
>
> (iv) is to the judge's knowledge likely to be a material witness in the proceeding.

---

[8] Canon 2 of the Michigan Code of Judicial Conduct in titled "A Judge Should Avoid Impropriety and the Appearance of Impropriety in All Activities" and provides, in pertinent part:

> A. Public confidence in the judiciary is eroded by irresponsible or improper conduct by judges. A judge must avoid all impropriety and appearance of impropriety. . . .
>
> * * *
>
> C. A judge should not allow family, social, or other relationships to influence judicial conduct or judgment. . . .

In *Caperton*, 556 US at 872, the United States Supreme Court held that due process requires a judge's recusal when " 'the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable.' " (Citation omitted.) Notably, this is an objective standard. *Id*.

At the outset, any reliance on the ground enunciated in MCR 2.003(C)(1)(g) is misplaced. In the present context, this provision is only implicated when an individual is within the third-degree of relationship to either the judge or the judge's spouse.[9] As explained in the trial court, Robinson's relationship to the trial judge's spouse was far in excess of three degrees.[10] Therefore, MCR 2.003(C)(1)(g) is inapplicable.

Further, there is no ground for disqualification under MCR 2.003(D)(1)(b) either. On the basis of objective and reasonable perceptions, there was not a serious risk of actual bias impacting defendants' due-process rights, and the trial judge did not fail to adhere to the appearance-of-impropriety standard in Canon 2 of the Michigan Code of Judicial Conduct.

Given (1) the remoteness of the familial relationship between the trial judge's husband and Robinson, and (2) the fact that neither the trial judge nor the husband knew of Robinson, it is unreasonable to advance that there was a serious risk of actual bias on behalf of the judge. Moreover, it should be stressed that by the time the trial judge was made aware of the distant familial relationship, the proofs in the trial had been closed and the juries had started their deliberations. This fact strongly cuts against any claim of actual bias. Likewise, once the verdicts were returned the remaining duty of the judge was to sentence defendants. Because of the guilty verdicts on the first-degree murder counts, these by statute required mandatory sentences of life without parole. In sum, under objective and reasonable perceptions, there was no serious risk of actual bias.

Likewise, the appearance-of-impropriety standard in Canon 2 was not implicated. While there was a distant blood relationship between Robinson and the trial judge's husband, neither the

---

[9] And that person must be (1) a party to the proceeding, (2) a lawyer in the proceeding, (3) is known by the judge to have more than a *de minimis* interest that could be substantially affected by the proceeding, or (4) is, to the judge's knowledge, likely to be a material witness in the proceeding. On its face, none of these four aspects apply to Robinson: he is not a party to the proceeding; he is not a lawyer in the proceeding; being deceased, he necessarily is incapable of having an interest in the proceeding; and he certainly is not going to be called as a witness.

[10] Robinson was described as the grandson of the trial judge's husband's first cousin. As the prosecutor correctly calculated, this puts Robinson as a sixth-degree relationship with the judge's husband. To calculate the degree of a relationship, you count how many generations "up" each person needs to go to get to a common ancestor, and then add the values for each person. See <https://rbvrealestateservices.wordpress.com/2015/04/27/calculating-the-degree-of-relationships/> (accessed May 28, 2025). For example, there is a two-degree relationship between a person and his or her grandparent. That same person has a fourth-degree relationship with a cousin, as each person is two degrees away from the common grandparent. Thus, if the cousin has a grandchild, that grandchild is two extra degrees away, for a total of six degrees.

-10-

judge nor the husband were aware of Robinson's existence as a family member. This type of situation does not create the appearance of impropriety. In short, under either the plain-error standard or a de novo standard, the trial judge did not err by denying defendants' motion to disqualify herself.

## IV. REMAINDER OF PRUITT'S ISSUES

For Pruitt's last issue, he argues that his minimum sentence of four years for his felon-in-possession conviction violates the two-thirds rule. We disagree. Whether a sentence violates the two-thirds rule as stated in *People v Tanner*, 387 Mich 683; 199 NW2d 202 (1972), and codified in MCL 769.34(2)(b) is a question of law that this Court reviews de novo. *People v Babcock*, 469 Mich 247, 253; 666 NW2d 231 (2003).

In *Tanner*, 387 Mich at 690, our Supreme Court held that "any sentence which provides for a minimum exceeding two-thirds of the maximum is improper as failing to comply with the indeterminate sentence act." The Legislature later codified this principle in MCL 769.34(2)(b), which states that a sentencing court "shall not impose a minimum sentence, including a departure, that exceeds 2/3 of the statutory maximum sentence." The Supreme Court has subsequently held that this rule applies to sentences imposed under the habitual-offender statutes. *People v Thomas*, 447 Mich 390, 392-394; 523 NW2d 215 (1994), citing *People v Wright*, 432 Mich 84; 437 NW2d 603 (1989). But the Supreme Court has repeatedly determined that this two-thirds rule does not apply to sentences where the statutory maximum punishment is "life or any terms of years." *People v Floyd*, 490 Mich 901 (2011); *People v Harper*, 479 Mich 599, 617 n 31; 739 NW2d 523 (2007); *People v Drohan*, 475 Mich 140, 162 n 14; 715 NW2d 778 (2006); *People v Powe*, 469 Mich 1032 (2004).

Pruitt in this instance was sentenced as a fourth-offense habitual offender under MCL 769.12. A conviction of felon-in-possession generally carries a sentence of five years. MCL 750.224f(6). But under MCL 769.12(1)(b), that sentence for a fourth-offense habitual offender becomes "life or for a lesser term." Thus, under Supreme Court precedent starting with *Powe*, the two-thirds rule is inapplicable. Pruitt acknowledges this line of caselaw and he does not dispute that these holdings apply. Rather, he avers that these cases were incorrectly decided and inconsistent with the Supreme Court's earlier holdings, and that this Court should essentially ignore them and remand the instant matter for resentencing. This Court must follow the established law of the Supreme Court unless that law is modified or overruled by the Supreme Court. *People v Metamora Water Serv, Inc*, 276 Mich App 376, 387-388; 741 NW2d 61 (2007). Consequently, Pruitt has failed to establish he is entitled to any relief in this Court.

## V. REMAINDER OF BENNETT'S ISSUES

### A. ADMISSIBILITY OF EVIDENCE

Bennett argues that the trial court erred when it admitted into evidence a gun found in a vehicle attributed to him. We disagree. Preserved evidentiary issues are reviewed for an abuse of discretion. *People v Mahone*, 294 Mich App 208, 212; 816 NW2d 436 (2011). A court abuses its discretion when it selects an outcome falling outside the range of reasonable and principled outcomes. *People v Dixon-Bey*, 321 Mich App 490, 496; 909 NW2d 458 (2017).

The day after the shooting, the police were trailing Bennett, whom the police identified as a suspect, while he was driving a black Chevy Malibu, and officers eventually surrounded the vehicle and arrested him. A black handgun was seized from the vehicle that looked similar to the one Bennett was seen wielding in the surveillance video from the liquor store. Notably, while there were other individuals in the car when it was stopped, the Malibu was registered to Bennett's wife, and inside the vehicle, there was a debit card with Bennett's name and a cell phone with a number attributable to Bennett.

Evidence is relevant and therefore generally admissible if it has *any* tendency to make a material fact "more or less probable than it would be without the evidence." MRE 401. The prosecution contended that the retrieved firearm was admissible because it made it more probable than not that it was the weapon Bennett wielded in the liquor store. The trial court, while relying on *People v Hall*, 433 Mich 573; 447 NW2d 580 (1989) (opinion by BOYLE, J.), admitted the weapon into evidence. In *Hall*, the Supreme Court stated that "[e]vidence of a defendant's possession of a weapon of the kind used in the offense with which he is charged is routinely determined by courts to be direct, relevant evidence of his commission of that offense." *Id*. at 580-581.[11] Bennett asserts that the evidence is not relevant because the admission of the gun "added absolutely nothing to the prosecution's case." The evidence did not add "absolutely nothing" though. The fact that Bennett was found with a firearm that looked similar to the one seen at the liquor store shooting makes it more probable than not that he was the person who was wielding that weapon that day. Thus, the evidence was relevant, and the trial court did not abuse its discretion by admitting the weapon into evidence.

What Bennett ostensibly is arguing is that the evidence was cumulative because the surveillance footage clearly portrays him wielding a weapon inside the liquor store, making his possession of a weapon that day not in dispute. Under MRE 403, relevant evidence can nonetheless be excluded if, among other things, "its probative value is substantially outweighed by the danger of . . . needlessly presenting cumulative evidence." Evidence of Bennett possessing a gun the day after the liquor-store incident arguably is cumulative, especially when his possession of a weapon in the liquor store is captured on video and uncontested. However, it also should be noted that the prosecution has the burden of proving each element of each offense beyond a reasonable doubt. *People v Smith*, 336 Mich App 297, 308; 970 NW2d 450 (2021). As such, the prosecution is permitted to present corroborative evidence supporting the various elements. See *People v Gayheart*, 285 Mich App 202, 227; 776 NW2d 330 (2009) (stating that corroborative evidence is not excludable simply because it is cumulative of other evidence). In this context, the trial court did not abuse its discretion by admitting the gun into evidence.

Moreover, assuming any error existed, Bennett would not be entitled to any relief. Reversal is not warranted unless it is more probable than not that the preserved, nonconstitutional error undermined the reliability of the verdict, i.e., was outcome-determinative. *People v Snyder*, 462 Mich 38, 45; 609 NW2d 831 (2000). Bennett does not attempt to explain how any error affected the outcome of the proceeding. Regardless, error, if any, had no impact on the outcome of the

---

[11] Although this opinion only had three justices who signed onto it, a fourth justice concurred with the analysis in this part of the opinion. See *Hall*, 433 Mich at 589 (BRICKLEY, J., concurring).

trial.  Again, the fact that Bennett possessed a handgun inside the liquor store is unopposed.  That possession was captured on videotape, and Bennett himself admitted that he regularly carried a firearm for protection, including on the day of the July 16, 2020 incident.  As a result, it is not more probable than not that any error associated with the admission of the firearm recovered from defendant the following day was outcome-determinative.

## B.  SCORING OF OFFENSE VARIABLES

Bennett next challenges the trial court's scoring of two of his offense variables (OVs).  This Court is to review a trial court's factual determinations with respect to the scoring of OVs for clear error, and those findings must be supported by a preponderance of the evidence.  *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013).  A factual finding is clearly erroneous when the reviewing court is left "with a definite and firm conviction that a mistake has been made." *People v McElhaney*, 215 Mich App 269, 273; 545 NW2d 18 (1996).  But this Court reviews de novo whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute. *Hardy*, 494 Mich at 438.

### 1.  OV 14

Bennett argues that the trial court erroneously assessed 10 points instead of zero points for OV 14.  We disagree.

OV 14 is appropriately assessed at 10 points when a defendant acts as a leader in a multiple-offender situation.  MCL 777.44(1)(a).  To determine whether a defendant was a leader in a multiple-offender situation, the entire criminal episode is evaluated.  MCL 777.44(2)(a).  Recognizing that the Legislature did not define what constitutes a "leader" for purposes of OV 14, this Court turned to dictionary definitions and determined that to lead is defined as "guiding, preceding, showing the way, directing, or conducting." *People v Rhodes (On Remand)*, 305 Mich App 85, 90; 849 NW2d 417 (2014).  Some factors to consider when determining if a defendant was a leader include whether the defendant acted first, gave any directions to the codefendant, or was otherwise a primary causal or coordinating agent. *People v Dickinson*, 321 Mich App 1, 22; 909 NW2d 24 (2017).

In this instance, Bennett was the one to first pull out his gun inside the liquor store.  Later, while pointing his gun at the front doors, Bennett instructed Pruitt to not let anyone leave.  Importantly, the evidence supports the conclusion that Bennett's instructing of Pruitt to not let anyone leave the store was the impetus for Pruitt to shoot Robinson and Young.  With Bennett initiating hostile behavior inside the store and giving Pruitt directions, the trial court did not clearly err by finding that Bennett was a leader and did not err by assessing OV 14 at 10 points.

### 2.  OV 19

Bennett also argues that the trial court erred when it assigned 10 points to OV 19.  We disagree.

"OV 19 applies if there was a 'threat to the security of a penal institution or court or interference with the administration of justice or the rendering of emergency services.' " *People*

*v Hershey*, 303 Mich App 330, 342; 844 NW2d 127 (2013), quoting MCL 777.49. "The trial court must assess 10 points for OV 19 if '[t]he offender otherwise interfered with or *attempted* to interfere with the administration of justice.' " *Hershey*, 303 Mich App at 342, quoting MCL 777.49(c) (emphasis added). When scoring OV 19, a court "almost always" considers the defendant's conduct after the completion of the sentencing offense. *People v Smith*, 488 Mich 193, 200; 793 NW2d 666 (2010).

On appeal, Bennett does not dispute that attempting to have evidence destroyed justifies an assessment of 10 points for OV 19. Indeed, such a contrary position would be untenable. See *Ericksen*, 288 Mich App at 204 (holding that 10 points were warranted when there was "evidence that defendant asked one of his companions to dispose of the knife he used to stab the victim and asked others to lie about his whereabouts during the night of the crime"). Rather, Bennett maintains that his comment to the store clerk, "Get rid of that, bro," does not show that he wanted the clerk to delete the security tape. Bennett's position is perplexing, as no other meaning is readily apparent. Bennett does not even explain what alternative interpretation should be attributed to that statement. Moreover, at trial, Bennett admitted that his statement to the clerk was a request for the clerk to delete the footage. Consequently, Bennett has failed to show how the trial court clearly erred by finding that he requested the video be deleted. The assignment of 10 points for OV 19 was therefore justified.

Affirmed.

/s/ James Robert Redford
/s/ Michael J. Riordan
/s/ Mariam S. Bazzi